TAMPA & JACKSONVILLE RAILWAY COMPANY, A CORPORATION, ETC., *Appellant,* v. SIDNEY J. CATTS, GOVERNOR OF FLORIDA, *et al.,* AS TRUSTEES OF INTERNAL IMPROVEMENT FUND OF FLORIDA, *Appellees.*

Opinion Filed March 11, 1920.

Petition for rehearing denied April 17, 1920.

1. Lands granted by a Legislature as payment for the construction of a railroad in accordance with certain specifications and through a particular area cannot be recovered by the grantee unless the railroad is constructed in accordance with the specifications and through the particular area set forth in the legislative grant.

2. To interpret and construe an act of the Legislature the court will ascertain the legislative intent, purpose, will.

3. To ascertain the legislative intent, purpose, will, the court will look to the condition of the country to be affected by the act, as well as to the purpose declared and will read all parts

of the act together. And should there have been former legislation touching the same subject-matter, it, too, should be taken into consideration.

4. Legislative grants of property or franchises are to be construed most strongly against the grantee.

5. When a contract contained within a legislative grant is brought before a court for construction and enforcement, the court should ascertain the terms of the contract and then give effect to such terms.

6. A court of equity will not confer its equitable relief upon a party complainant, seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for all the equitable rights, claims and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject-batter of the controversy. Such court will give the relief to which the complainant is entitled only upon condition that he has given or consents to give, the defendant such corresponding rights as he also may be entitled to in respect of the subject-matter of the suit. "He who seeks equity must do equity."

7. Whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or award any remedy. "He who comes into equity must come with clean hands."

8. A party to a contract who fails to perform a material obligation of the contract is not in court with clean hands when he seeks aid of a court of equity in the protection of his alleged rights arising out of or connected with the contract, and is not entitled to the relief prayed.

An Appeal from the Circuit Court for DeSoto County; John S. Edwards, Judge.

Order affirmed.

*N. B. K. Pettingill* and *Arthur F. Odlin,* for Appellant;

*Glenn Terrell,* for Appellees.

BRANNING, Circuit Judge—Tampa and Jacksonville Railway Company, a corporation, appellant brought suit in equity against Sidney J. Catts, Governor of the State of Florida, and others composing the Board of Trustees of the Internal Improvement Fund, to compel a conveyance of 280,000 acres of land. A demurrer was interposed by defendants and said demurrer was sustained by the court. Complainant appealed. The matter comes before this court to review the ruling upon said demurrer.

This cause has been before this court before upon pleadings.

I shall confine my discussion of the demurrer to only those grounds which test whether there is equity in the bill.

The pleader alleges in the amended bill, the creation and history of the Internal Improvement Fund and that the defendants are the duly appointed Trustees of said fund; that Gainesville, Rocky Point and Micanopy Railway was organized under the general laws of Florida; that it was provided in its charter that said railway should be constructed from a point at or near Gainesville, thence in a Southwesterly direction to place familiarly known as Rocky Point at or near the town of Mic-

anopy, all in the County of Alachua, a distance of about thirty miles; that March 20th, 1894, by resolution of the Board of Directors of said Railroad the route was determined to be from Gainesville to Rocky Point, and from Rocky Point to Micanopy, in Alachua County, Florida; that subsequent to March 20th, 1894, construction was begun by said corporation along the altered route between said terminal points and that said construction has been completed to said town of Micanopy and beyond to the line between Alachua and Marion County on or before May 25th, 1895.

That Chapter 4475, Laws of Florida of 1895, changed the name of said corporation to Gainesville and Gulf Railway Company and authorized it to extend its line of railway in a southerly direction from the point to which it was then constructed in the County of Marion, through the Counties of Marion, Citrus, Hernando, Pasco and Hillsborough, in said State of Florida, to some accessible point on the coast of the Gulf of Mexico, or on the coast of Tampa Bay, and to construct and maintain such extensions, side tracks, offices, shops, warehouses, wharves, bridges, buildings as might be needed for the operation of said line of railway, and granted the usual railroad corporate franchises; that the State of Florida to enable said Railway Company to construct and equip its said railway, gave and granted to it alternate sections of land granted to the State of Florida by the United States, or to be granted by the United States to the State of Florida, within six miles of its said railway, to be constructed, applicable to such purpose; that in consideration of the greatly improved value which would accrue to said State of Florida, it further granted to said Railway Corporation, in addition to the alternate sections as above set forth, ten thousand (10,000) acres of land for each

mile of railway which said Railway corporation might construct in the State of Florida; (then follows detail description of lands out of which such grant, if earned, might be fulfilled).

Section six of said bill is:'

That in and by said last cited Act it was further provided that the lands granted to said Gainesville and Gulf railway Company should vest in said Company as said railroad should be graded, crosstied and ironed in sections of five miles, and that upon the filing of the certificate of approval and completion by the officer designated by said Trustees of said Internal Improvement Fund, deeds should be made to said Gainesville and Gulf Railway Company by the Trustees of said Internal Improvement Fund, as said land should be vested and acquired under said Act; but that no rights should vest under said Act unless the construction of said railroad should be commenced within one year from the passage of said Act, and should be continued with reasonable diligence, and that no benefit from said land grant should be claimed for or on account of any part of the railroad constructed after seven years subsequent to the passage of said Act.

Section seven of said bill is:

That in pursuance of said Act of May 25, 1895, and relying upon the grants of land thereby made by said State of Florida, said Gainesville and Gulf Railway Company did within one year from the passage of said Act proceed to grade, cross-tie, complete of standard guage, equip and place in operation an extension of its said line of railway from the division line between said Alachua and Marion Counties on through the County of Marion to a point called Fairfield in said County of Ma-

rion, a distance from said county line of a little more than eight miles; that the part of said line from the boundary line between Alachua and Marion counties to the station called Irvine or McCrary station (a distance of five miles) was completed between said 25th day of May, 1895, and the 15th day of November, 1895; that said line for said distance of five miles was examined by the engineer of the defendant Board of Trustees of the Internal Improvement Fund and reported by him to be in accordance with the Internal Improvement Act, which report was accepted by said Trustees; that the line over the remaining distance from said Irvine to Fairfield, to-wit a distance of three miles, was completed between the date last aforesaid and the end of the year 1897, and that the construction of said last described three miles of line was in all respects the same and complied to the same extent with the requirements of said Internal Improvement Act as did the line for the five miles which was approved and accepted by the Trustees as aforesaid.

Section eight of said bill is:

That thereafter late in the year 1898 construction was begun on an extension of the line of your orator from Gainesville in a Northeasterly direction to Sampson City in Bradford County, a distance of twenty miles, and that the line of your orator's road over said distance of twenty miles to Sampson City was completed before the end of the year 1899; that said last mentioned line of railroad was constructed of standard guage in the same manner as and complied in all respects with the requirements of said Internal Improvement Act equally with the road constructed from the Marion County line to Irvine examined and accepted by the defendant Trustees as aforesaid; and that, by virtue of the construction of the said

twenty-eight miles of railroad above described in substantial compliance with the provisions and conditions stipulated in the Act of May 25th, 1895, the said Gainesville & Gulf Railway Company became of right entitled to have conveyed to it by the defendant Trustees in accordance with the terms of said Act 280,000 acres of said swamp and overflowed lands granted by the Act of Congress of Sept. 25th, 1850, as aforesaid.

That the Tampa and Jacksonville Railway Company was incorporated under the laws of the State of Florida and that it and Gainesville and Gulf Railway Company were consolidated under the Statutes of the State of Florida under the name of Tampa and Jacksonville Railway Company and that Tampa and Jacksonville Railway Company thereby became the successor to the right of said Gainesville and Gulf Railway Company to a conveyance of said 280,000 acres of land.

Section ten of said bill alleges defendants failed and neglected to designate any officer under section six (6) of said Act of May 25th, 1895; that complainant, February 21st, 1912, made formal request for such designation to be at once made of some officer to make certificate of completion and approval of twenty-three miles of railroad, but defendants failed and have continued to fail and neglect to designate such officer, up to date of filing bill, although requested so to do.

Section eleven of said bill contains allegations of defendants failure and refusal to convey lands as provided in said Act of May 25th, 1895.

Section twelve of said bill alleges other land grants and litigation growing out of same; that because of such litigation complainant did not learn until a short time

before making request in February, 1912, that there were held by said defendant Trustees land applicable to the fulfillment of said contract, and grant. That all said swamp and overflowed lands which have been patented to the State of Florida by the United States under the Act of Congress and were owned by it at the time of filing the original bill and recording the lis pendens herein were and are applicable to the satisfaction of the land grant contained in the Act of May 25, 1895, a description of which is shown in schedule marked exhibit "A." The lands shown in the schedule lying nearest the line of road are situate in DeSoto County.

Section 13 contains a general recapitulation of the allegations of performance and that complainant as successor to grantee under Chapter 4475, Laws of Florida of 1895, is entitled to a conveyance of 280,000 acres of land to be selected from lands described in aforesaid schedule attached to the original bill.

Section 14 contains allegations that defendants will dispose of the lands in violation of law and the contract and grant.

There is a prayer for injunction; for a conveyance and for other relief.

There are nineteen points of law assigned to be argued in the demurrer to the bill of complaint.

They raise the question as to whether or not complainant has shown such performance upon its behalf as to entitle it to any relief in a court of equity in the nature of specific performance.

In determining the meaning of Chapter 4475, Laws of Florida of 1895, we have to bear in mind that it is an Act of the Legislature; a grant of a franchise; and

a contract if accepted and complied with by the grantee.

As an act of the Legislature to interpret it we must ascertain the legislative intent, purpose, will. As a grant of a franchise it must be construed most strongly against the grantee. As a contract we must ascertain what was agreed to between the parties and enforce the agreement made.

To ascertain the legislative intent, the court will look to the condition of the country when the act was passed, as well as to the purpose declared, and will read all parts of the act together. Winona & St. P. R. Company v. Barney, 113 U. S. 618, 5 Sup. Ct. Rep. 606, 28 Law Ed. 1109; Kansas City L. & S. K. R. Co. v. The Attorney General, 118 U. S. 682, 7 Sup. Ct. Rep. 66, 30 Law Ed. 281.

To do this one should read Chapter 4475, Laws of Florida, 1895, together with an Act, to provide for and encourage a liberal system of internal improvements in this State passed January 6th, 1855, and the amendments thereto. Then take into consideration the fact that the area to be traversed by the route for the proposed railroad outlined in said Chapter 4475, Laws of Florida of 1895, was at that time sparsely settled and without means of transportation.

The language quoted in the bill is "the said Gainesville and Gulf Railway Company was thereby authorized to construct and extend its line of railway in a southerly direction from the point to which it was then constructed in the County of Marion, through the Counties of Marion, Citrus, Hernando, Pasco and Hillsborough, in said State of Florida, to some accessible point on the coast of the Gulf of Mexico, or on the coast of Tampa Bay, and to construct and maintain such extensions, side

tracks, offices, shops, stations, warehouses, wharves, bridges and buildings as might be needed for the operation of said line of railway, and by and under said name, to have and to hold and enjoy such real and personal property as might be necessary for the uses and purposes of said corporation, and to have and enjoy all rights, privileges, immunities and franchises then conferred, or which might be conferred upon railroad corporations by and under the laws of Florida."

And further in said bill is quoted "that in consideration of the greatly improved value which would accrue to said State of Florida from the construction of said railway in said State of Florida it further granted; etc."

It was clearly the legislative intent to develop a particular area of the State of Florida and give it a railway outlet either to the Gulf coast or to Tampa Bay. The purpose to be achieved and the end to be obtained, improved value to property and facilities and accommodations such as to invite an immediate settlement of the particular area of the State of Florida.

What does the contract provide that the State of Florida should receive in exchange for its land?

"* * * line of railway in a southerly direction from the point where it is now constructed in Marion County, Florida, through the Counties of Marion, Citrus, Hernando, Pasco and Hillsborough, in this State to some point on the coast of the Gulf of Mexico, or on the coast of Tampa Bay."

"The said Company shall comply with the provisions of the act entitled an act to provide for and encourage a liberal system of internal improvements in this State, approved Jan. 6th, 1855, and the amendments thereto,

as to the manner of constructing the road and drainage, said railroad to be of standard guage." * * * "No rights shall vest under this act unless the construction shall be commenced within one year and be continued with reasonable diligence."

What does complainant allege that it has done by way of performance and for which it claims it is entitled to a conveyance of 280,000 acres of land.

In section three of the bill the allegation is:

"Construction had been completed to said town of Micanopy and beyond to the line between Alachua and Marion Counties on or before the 25th day of May, 1895."

As to the detail of other allegations of performance see allegations in section seven and eight of bill hereinafter quoted in full.

Do these allegations of performance constitute a full performance on the part of complainant and its predecessors under the terms and conditions of Chapter 4475, Laws of Florida of 1895? Clearly no.

Do these allegations of performance constitute such a partial performance on the part of complainant and its predecessor as to entitle complainant to any relief in a court of equity?

For all that portion of the alleged construction from "Gainesville in a northeasterly direction to Sampson City, in Bradford County, a distance of twenty miles," one can find no authority for such construction in said Chapter 4475, Laws of Florida of 1895, the contract herein sued upon.

This limits our consideration to those allegations of performance contained in section seven of the bill of complaint as hereinbefore set forth.

The allegations as to that portion of the railroad between the boundary line between Marion County and Alachua County and the station called Irvine (distance five miles) to the effect that the report of an engineer that the construciton of it complied with the requirements of the Internal Improvement Act was accepted by the Trustees, being admitted by the demurrer, is a good allegation as to the construction of that particular five miles of railroad.

The allegation as to the construction of the railroad between Irvine and Fairfield (distance three miles), "That the construction of the last described three miles of line was in all respects the same and complied to the same extent with the requirements of said Internal Improvement Act as did the line for the five miles which was approved accepted by the Trustees as aforesaid" is the conclusion of the pleader.

In considering the relation of the parties to this cause, their rights and duties growing out of the contract and the facts of performance as alleged, certain time honored maxims come to our aid.

"He who seeks equity must do equity."

Mr. Pomeroy in paragraph 385, Volume One, Third Edition, says: "The meaning is, that whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for all the equitable rights, claims and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject matter of the controversy. It says, in effect, that the court will give the plaintiff the relief to which he is

entitled, only upon condition that he has given, or consents to give, the defendant such corresponding rights as he also may be entitled to in respect of the subject matter of the suit."

"He who comes into equity must come with clean hands."

"It (the maxim) assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity, and therefore refuses him all recognition and relief with reference to the subject matter or transaction in question. It says that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court wil be shut aaginst him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or award any remedy." Vol 1, Pomeroy, third edition, paragraph 397.

"A party to a contract who fails to perform a material obligation of the contract is not in court with 'clean hands' when he seeks aid of a court of equity in the protection of his alleged rights arising out of or connected with the contract, and is not entitled to the relief prayed." Vol. 4, A. L. R., note c, page 73, citing Ashe-Carson Co. vs. Bonifay, 147 Ala. 376; 41 So. 816.

Mr. Justice Mabry in the case of Pensacola Gas Co. vs. Provisional Municipality, heretofore decided by this Court, 33 Fla. 322, 14 So., text 833, says: "The authorities are numerous and uniform in enforcing the rule that it is incumbent upon a party who asks a court of chancery to compel the specific performance of a contract to show that he has performed, or been ready, willing and

able to perform all of the essential terms of the contract on his part (citing authorities). This is upon the principle that he who seeks equity must do equity, and it requires of the complainant that he do all within his power to fulfill his part of the contract which he is seeking to enforce, according to its terms. He must do his full duty, or the court will not regard his prayer."

In the light of these principles we do not deem the construction of the five miles alleged, or even allowing the additional three miles, is such a performance as will entitle complainant to any relief in equity.

As was said, note c, page 74, Vol. 4, A. L. R., "in Montana Water Co. vs. Billings (1914), 214 Fed. 121, appeal dismissed in (1915), 139 C. C. A. 665, 224 Fed. 1021, the suit was for the specific performance of the renewal clause of a contract to supply the defendant city with pure and wholesome water for the public use. At the expiration of the contract period the defendant by the terms of the agreement was to exercise an option to purchase the water system, with the alternative of renewing its contract with the plaintiff for a like period of time. The evidence disclosed that plaintiff had not been supplying the city with pure and wholesome water as required by the contract, and had not taken steps to remedy the condition. The court held that the plaintiff was not entitled to the relief prayed for, saying: 'Here, the fact remains that complainant failed in its most vital obligation, involving the health and well being of a large community, and is vulnerable to the maxim, 'He who comes into equity must come with clean hands.' "

And so it is with the case before the court, the complainant has utterly failed to provide its "line of railway in a southerly direction from the point to which

it was then constructed in the County of Marion, through the Counties of Marion, Citrus, Hernando, Pasco and Hillsborough, in said State of Florida, to some accessible point on the coast of the Gulf of Mexico, or on the coast of Tampa Bay;" and has left this area without railroad facilities and the people there without railroad accommodations contemplated by the legislative grant and provided in the terms of the contract sought to be enforced. And so complainant herein is likewise vulnerable to the maxim, "He who comes into equity must come with clean hands." Also complainant is likewise vulnerable to the maxim, "He who seeks equity must do equity."

This disposing with the equity claimed for the bill, the bill should be dismissed. The dismissal of the bill carrying with it the lis pendens the Court is not called upon to dispose of the question raised concerning the lis pendens.

The ruling of trial court should be sustained, the order affirmed and the bill dismissed.

BROWNE, C. J., AND TAYLOR AND WHITFIELD, J. J., AND CAMPBELL, Circuit Judge, concur.

ELLIS AND WEST, J. J., disqualified.