77 So.2d 800 (1955)
UNITED SERVICE CORPORATION, a Florida corporation, Appellant,
v.
VI-AN CONSTRUCTION CORP., a Florida corporation, Jesse A. Owens and Mae Fincher Owens, his wife, Appellees.
Supreme Court of Florida. Special Division A.
January 25, 1955.
Rehearing Denied February 22, 1955.
*801 George J. Baya, Miami, for appellant.
Herbert Schwarz, Miami, for John Nicholas, as Trustee & Receiver in Bankruptcy of the Estate of Vi-An Construction Corp.
J. Tillman Pearson, Miami, for Jesse A. Owens and Mae Fincher Owens, appellees.
DREW, Justice.
Appellant, United Service Corporation, (hereafter called United) loaned money to Vi-An Construction Corp., one of the appellees, (hereafter called Vi-An) in connection with a real estate development in Dade County.
About the time that Vi-An had completed a residence on Lot 14, Block 1 of Biscayne Gardens, Section 8, Part 5, according to the plat thereof recorded in Plat Book 49, page 3 of the public records of Dade County, Florida, it found purchasers for the same in Jesse A. Owens and Mae Fincher Owens, his wife, who then resided in the City of Atlanta, Georgia. The purchase price was $13,500, of which sum the purchasers paid $1,000 and secured therefor a preliminary receipt or contract of sale which provided for the delivery of a good and sufficient title, free of encumbrances, and the payment of the balance of $12,500 in cash at the time of taking title. A little while after the contract was entered into the Owens employed an attorney who examined the title and furnished them with an opinion thereto setting forth, among other things, that the property was encumbered by two mortgages, one in favor of United in the sum of $8,250 and the other in favor of H-5 Corporation in the sum of $1,200. In this appeal we are not concerned with the smaller mortgage.
On the day the Owens received a copy of the title opinion, the president of Vi-An, Vincent Cravero, called an attorney named Hagearty to meet with the Owens and their daughter and son-in-law, and Mr. Cravero and his wife, as president and secretary of the Vi-An Construction Corp., for the purpose of closing the transaction. It appears that Hagearty was employed by Cravero *802 solely for the purpose of drawing the deed. The parties met in Hagearty's office and there was a discussion concerning the mortgages and the details of closing. The deed was prepared and was executed then and there by Mr. and Mrs. Cravero, as president and secretary of the corporation. The question of the mortgages was discussed and it was agreed that inasmuch as Mr. Owens' check for $12,500, the balance of the purchase price, was drawn on an Atlanta bank, the mortgages could not be satisfied at that time but that it would be necessary to wait a few days until the check cleared. Apparently at the suggestion of Mr. Cravero, the check of the Owens was made payable to Vi-An and at that time delivered to the seller so that it could be deposited for clearance. There is some dispute as to whether the check was actually handed to Mr. Cravero by Mr. Owens or was handed to Hagearty and by him handed to Mr. Cravero. In any event, the substance of the testimony is that Mr. Hagearty was to keep the deed until the check cleared and Mr. Cravero delivered him the original mortgage, original note and satisfaction at which time he, Hagearty, was to record the satisfaction and the deed.
Cravero deposited the check on November 5th to the account of Vi-An. On November 11th, Cravero called the offices of United, with whom he had had extensive dealings of a similar nature, over a long period of time, and told them he would like to pick up the satisfaction of the mortgage on Lot 14, of Block 1. Later during the same day, he called at the office of the United and received an envelope containing the original mortgage, original note and duly executed satisfaction. Cravero placed these in his brief case where he held them for several days and until they were delivered to Hagearty, who recorded both the satisfaction and the original deed on November 24th. In the meantime, and two days subsequent to the time that United delivered the original mortgage, original note and satisfaction to Cravero, Cravero delivered a check to them in payment of the principal and interest due. We get the definite impression from the extensive testimony that this was not an unusual manner of handling matters of this kind because of the close relations and extensive financial dealings of these parties. This check was received by United on November 13th and deposited by it on that date. On November 18th, the check was returned because of insufficient funds but was redeposited by United at the request of Cravero. On November 21st the check was again returned, was held by United for three days, or until the 24th of November, and was deposited the third time. The check again was returned for insufficient funds on the 28th of November.
Between the time of the return of the check on the first occasion and its return the third time on November 28th, negotiations had taken place between United and Cravero concerning the precarious financial condition of Vi-An. During this period, and even though United was familiar with such precarious financial condition of Vi-An, United made additional advances in connection with the development. Beginning about the first of December there were numerous meetings between the officials of United and the officials of Vi-An with reference to the financial condition of the latter concerning a refinancing of the entire project and particularly concerning a proposition whereby Vi-An would assign certain of its assets over to United in connection with other obligations and indebtednesses existing between the companies. It was not until the latter part of December or early in January that Mr. and Mrs. Owens were advised or had any knowledge of the fact that the funds which they had delivered to Mr. Cravero had not been used in paying off the $8,250 mortgage. The first actual knowledge that they had of any trouble in the matter was when they were advised in the latter part of December by United and its attorney that they had better consult an attorney with reference to the matter. It was not until January 12th when suit was instituted by United to foreclose the previously satisfied mortgage that they actually knew just what position was being taken by United with reference to the matter.
*803 The lower court heard extensive testimony on the issues and entered a decree refusing to re-establish or enforce the mortgage lien. It is from this decree that this appeal has been taken by United.
It is the contention, among other things, of United that the mortgage was satisfied as a result of fraud practiced upon the mortgagee or mistake or accident and that the same should be re-established and foreclosed. They insist that such satisfaction should not inure to the benefit of the Owens because they, the Owens, did not rely upon the satisfaction when they paid their money to Cravero. They insist that this case is governed by the general principle of law, well recognized in this and other jurisdictions, that where the release or satisfaction of a mortgage is the result of fraud, accident or mistake, it will not inure to the benefit of a person acquiring an interest in the property who did not rely or advance anything on the faith of such discharge. They insist that if the satisfaction did not enter into or induce the transaction, the restoration of the mortgage or the re-establishment of it does not operate prejudicially against the Owens or place them in any worse position than they were before. See 59 C.J.S., Mortgages, § 282 c. (4), page 351; 36 Am.Jur. 940, sec. 511.
This Court has long since recognized that a satisfaction of a mortgage procured by fraud or made through mistake may be cancelled if other parties having no notice of the fraud have not in the meantime acquired an interest in the property. Lovell v. Wall, 31 Fla. 73, 82, 12 So. 659, 661. In the foregoing case we held that no rights of third parties had intervened. We further held, "There was no payment or satisfaction of the mortgage debt, and no valid cancellation of the mortgage. Mistakes as to the condition of one's title, or the correctness or regularity of antecedent proceedings may be classed with mistakes of fact, and are properly relieved from where the equity is clear." (Emphasis supplied.) In Chappell v. Nalle, 119 Fla. 711, 713, 160 So. 867, 868, we said, "The generally approved rule in such situations is that if the rights of innocent third parties have not intervened equity will grant relief to those who have through mistake released a mortgage before the debt was fully paid." The above principles are firmly established and supported by abundant authority. The record is convincingly clear that when the Owens delivered their check for $12,500 to Cravero they had knowledge of the outstanding mortgages. The subsequent execution of the satisfaction and the delivery of it and the original mortgages and notes in no way induced them to part with such sum of money. Moreover, the record is abundantly clear that at the time United delivered the satisfaction and the original note and mortgage to Cravero without being paid in advance, Cravero's bank account had dwindled to the point that he did not have enough of the funds which had been previously given him by Owens to pay off the principal and interest due on the mortgage and was in serious financial difficulties finally resulting in bankruptcy. The argument of United that its negligence in delivering the satisfaction of the mortgage and the original mortgage and note to Cravero did not result in any injury to the Owens is logical and well taken. We are firmly of the view that had United acted promptly and in good faith when it discovered that the check given it by Cravero was not honored because of insufficient funds, and had then and there placed the Owens on notice thereof, and had advised the Owens that the satisfaction and original mortgage and note had been procured by them through fraud or misrepresentation on the part of Cravero or by mistake or had been satisfied by accident, they would have brought themselves within the rule which we have heretofore discussed and would then have been in a favorable position, under the circumstances of this case, to have sought the re-establishment of their mortgage and its foreclosure in the Equity Court. The failure of United to take this affirmative action promptly invoked the well-established rule that "if one remains silent when it is his duty to speak, he will not be permitted to speak when in *804 justice he should remain silent." Instead of promptly notifying the Owens that Cravero had misappropriated the funds which they had entrusted to him and had not paid the mortgage which he was under obligation to pay, (knowledge not possessed by the Owens) and placing the Owens in a position then and there to take appropriate legal action to recoup the monies which were entrusted to Cravero, United elected to deal with Cravero and to redeposit the bad check on three separate occasions. Moreover, United, having knowledge of the precarious financial condition of Cravero and his company  a fact wholly unknown to the Owens  proceeded to advance Cravero and his company additional monies and to negotiate with Cravero with reference to obtaining security for other obligations which existed between them. It was not until late in December and probably not until January 12th that the Owens knew or even suspected that United intended to look to them instead of Cravero and his company for the payment of the mortgage. Under such circumstances, it would be inequitable and unjust to extend to United the aid of equity in re-establishing its mortgage and the lower court was eminently correct in so holding.
The principle which we discussed in the forepart of this opinion, allowing the re-establishment of a mortgage which has been paid or cancelled through mistake or fraud or accident, is primarily concerned with the effect of such satisfaction as between the mortgagor and the mortgagee. Woven throughout the decisions dealing with this question, as well as the discussion of it by the text writers, is the observation that such principle will be enforced only if the rights of innocent third parties have not intervened. In this case the conduct of United after it discovered the defalcation of Cravero operated to the disadvantage of the Owens and from that point on they fell into the same category as innocent third parties referred to in the foregoing authorities. The Owens would probably have been in an exceedingly strong position to have recouped at least a part of their loss had United notified them promptly. There was negligence on the part of both Owens and United. Owens was negligent in paying over his money to Cravero without first securing the satisfaction of the mortgages. United was negligent in its careless manner of delivering to Cravero the original note, mortgage and satisfaction without requiring payment therefor. The rule is firmly settled that where one of two innocent parties must suffer a loss, the loss must fall on the one whose negligence or conduct contribute the greater to the loss. Had United acted promptly, as we have heretofore suggested, we think the application of the principle announced would have warranted the re-establishment of the mortgage. But the conduct of United after the discovery of the desperate financial condition of Vi-An was sufficient to place the greater blame and the greater negligence on its shoulders. In passing on this question the lower court said "On consideration of the evidence, including that bearing on the status and experience of the parties involved, the history of their dealings and opportunities to know or anticipate actions of the others and their dealings and conduct after discovery of the fraud or default, this Court finds that the evidence preponderates in favor of the defendant owners of the property. The negligence and actions of the plaintiff place a definite excess of blame on plaintiff for the result." (Emphasis supplied.) The lower court further said "Even if the negligence or neglect of the parties in this connection were equal, the court would still be required to leave the parties in their present positions and would not be justified in shifting the present status of loss from one party to the other as prayed for by the plaintiff."
In Tampa & J. Ry. Co. v. Catts, 79 Fla. 235, 247, 85 So. 364, 367, we quoted from Pomeroy on equity jurisprudence as follows:
"`He who comes into equity must come with clean hands.'
"`It (the maxim) assumes that the suitor, asking the aid of a court of equity, has himself been guilty of conduct in violation of the fundamental *805 conceptions of equity, and therefore refused him all recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or award any remedy.' Vol. 1, Pomeroy, third edition, par. 397."
It must be remembered that here we are talking about principles relating to remedies. The mortgage has been satisfied. The legal rights of the parties have become fixed. The question we are considering is whether equity will lend its aid to restore the mortgage to verity and enforce its payment. In our judgment the scales of justice are sharply inclined in favor of the appellees. Loss must be suffered by one or the other. We agree with the lower court that the greater fault lies with appellant.
Affirmed.
MATHEWS, C.J., SEBRING and ROBERTS, JJ., concur.