## COFFMAN *v.* MCKEE

### Opinion delivered January 1, 1917.

1. CONTRACTS—COMPROMISE OF DISPUTED CLAIM.—The compromise of a disputed claim is a sufficient consideration to uphold the terms thereof.

2. CONTRACTS—COMPROMISE OF DISPUTED CLAIM—AGREEMENT BETWEEN PROMOTERS AND SUBSCRIBERS TO STOCK.—Certain persons held an option to purchase certain coal lands, and secured certain other persons, H. and G., to assist in the purchase and the organization of a corporation. The appellees were induced to purchase stock in the corporation, for cash, before the lands were purchased under the option. The cash subscribers became dissatisfied, and the option holders and H. and G. addressed to them a circular letter, stating a certain compromise agreement, which was accepted by the dissatisfied cash subscribers. *Held*, the option holders and H. and G. were bound by the terms of the circular letter.

3. CORPORATIONS—DEBTS—LIABILITY OF ORGANIZERS.—The holders of options to purchase certain coal lands, the promoters of the organization of a corporation and the sale of the stock, and the cash purchasers of stock therein, *held*, liable for the debts of the corporation in proportion to their several interests therein.

Appeal from Pulaski Chancery Court; *J. E. Martineau*, Chancellor; reversed.

STATEMENT BY THE COURT.

Appellees instituted this action against appellants in the chancery court to have certain shares in the Arkansas Anthracite Mining Company, a domestic corporation, declared to be preferred over the stock in that corporation held by appellants. The material facts are as follows:

In the early part of 1905 and for some time prior thereto the business of mining coal was in a very prosperous condition in the State of Arkansas. This was especially true as to the Spadra Coal Fields on the north side of the Arkansas river in Johnson county, Arkansas, and which were situated on and near the Little Rock & Fort Smith Railroad. The coal fields extended across the river opposite the Spadra coal fields. There was no railroad on the south side of the river and coal lands could not be mined successfully unless they were near to

a railroad. They were practically valueless unless so situated. In anticipation of a railroad being constructed on the south side of the Arkansas river through these coal fields in Logan county, Arkansas, J. W. Coffman, G. O. Patterson, Jas. P. Hoye, William Brooks and J. E. Nichols secured options on between twenty-five and thirty thousand acres of land underlaid with coal. They endeavored to interest eastern capitalists in their venture, their intention being to organize a corporation and sell the coal lands to it for a stipulated price. They intended to secure enough money from the sale of stock in the proposed corporation to pay for the lands on which they had options and which they proposed to sell to the corporation to be organized to develop them. They intended to sell the lands to the corporation at a profit and receive in payment therefor stock in the corporation. At first they did not succeed in interesting any capitalists in the enterprise. In the early part of 1905, William Brooks approached H. L. Remmel about organizing a corporation to, purchase and develop the coal lands. Mr. Remmel consulted Geo. B. Rose, an attorney, about the matter and succeeded in getting him interested in the proposition. Coffman and his associates had secured options to purchase the lands at an average price of $10.00 per acre. After some negotiations the option holders entered into a contract with Messrs. Remmel and Rose whereby the latter were to organize a corporation which would purchase the lands from them at $35.00 per acre and that the money received from subscribers for stock in the proposed corporation should be used in paying for the lands. The option holders were to receive shares of stock to the amount of the difference between ten and thirty-five dollars per acre on the number of acres sold to the corporation, this being the profit they would make in the transaction without deducting the expenses they had been out in securing the options. They agreed to transfer to Messrs. Remmel and Rose, $50,000.00 of their stock for their services in promoting and organizing the corporation. Messrs. Remmel and Rose accepted

their proposition and immediately proceeded to organize the corporation. Mr. Remmel subscribed for $10,000 of the stock to be paid in cash and Mr. Rose for $15,000 to be paid in cash. Remmel succeeded in securing the friends of himself and of Mr. Rose to subscribe for a large amount of stock for cash. The proposed corporation was the Arkansas Anthracite Coal Company. In order that the corporation might have consistent policies until the coal lands had been developed and in order that the rights of minority stockholders might be protected, what was called a stock subscription contract was prepared and executed. This contract provided that all stock of the company was to be issued to J. W. Coffman, H. L. Remmel and Geo. B. Rose as trustees. These trustees were to hold and vote all the stock of the company, save the qualifying shares of the directors, for the period of fifteen years. All stock certificates held in trust were to be kept in safe deposit vaults in the Mercantile Trust Company of Little Rock in a box specially provided for that purpose. The trustees issued certificates to the stockholders for the amount of shares of stock to which each shareholder was entitled. After securing a large number of subscribers to stock in the city of Little Rock, Mr. Remmel went to several eastern cities to secure additional cash subscribers for stock. When he returned early in June, 1905, he found that a number of the subscribers for stock had become dissatisfied and threatened to withdraw from the corporation unless certain demands were acceded to by the option holders and Messrs. Remmel and Rose. Their action in this respect threatened to prevent the organization of the corporation until the options on the land had expired, or at least to throw serious obstacles in the way of its organization. Hence a meeting was called of all the interested parties which was held in Little Rock, Ark., for the purpose of adjusting the differences between the cash subscribers of the stock and the option holders and Messrs. Remmel and Rose. Various propositions were made at the meeting looking to an adjustment of their differences but no

agreement was reached between the parties. In a day or two thereafter, viz., on June 15, 1905, a circular letter signed by H. L. Remmel and Geo. B. Rose was ad- dressed to the cash subscribers to the stock of the Arkansas Anthracite Coal Company and mailed to each of them. We quote from the beginning of the letter the following:

"We are glad to tell you that we have been able to procure from the holders of options the following concessions:

"June 12, 1905. To the cash subscribers to the stock of the Arkansas Anthracite Company:

"It has been suggested that if the 10,000 acres which you contemplate acquiring should be sold for less than $350,000, we would still make something while you would lose money.

"To show our confidence in the enterprise we agree that if you will go on and acquire 9,000 or more acres of the land under our options and said lands should sell for less than $35.00 per acre, you may first be repaid all the money that you pay in on your subscription, leaving only the residue to us."

We also quote from the circular letter as follows:

"It has been suggested that if the property were sold at less than $35.00 per acre, we would still make a profit on our investment, by reason of the stock which is given us by the option holders in payment for our services. Such an idea had not occurred to us; but as it has occurred to others, we will say that if the property is sold for less than $35 an acre, you will first be repaid out of the proceeds of the sale the sums paid in by you before anything is paid us on the stock received by us from the option holders for our services aforesaid."

The circular letter had the effect of satisfying most of the subscribers of the stock who had already signed the subscription contract and it also succeeded in inducing many others to subscribe.

Mr. Rose went to Logan county where the lands were situated and spent the greater part of the summer of 1905 in examining the titles to the lands on which the

options had been secured and did a great deal of work in perfecting defective titles. Deeds were finally secured to about 15,000 acres of land underlaid with coal from three to five feet thick. The fields were examined by a competent mining engineer, who estimated the amount of coal at 98,000,000 tons. By May, 1913, the company became indebted in the sum of near $100,000 for taxes, interest and money spent in developing the property. The trustees sent out a circular letter calling upon all the stock holders to pay an assessment to take care of current expenses, such as interest and taxes. The stockholders became dissatisfied and a meeting was called and held in Little Rock on July 8, 1913, for the purpose of discussing the condition of the corporation. At this meeting the cash stockholders learned that the option holders and Messrs. Remmel and Rose were denying them any rights under the circular letter already referred to. This suit was filed by Chas. McKee for himself and all other cash stockholders asking for an accounting and the recognition and enforcement of their rights under the circular letter above referred to. The defendants answered and denied liability under the terms of the circular letter. Before the decree was entered of record, all the stockholders were notified of the pendency of the action and became parties thereto. On June 5, 1916, a decree was entered in which the court finds:

"That the defendants, H. L. Remmel and Geo. B. Rose, were employed by the other defendants to raise money for the purchase of the coal rights in the lands now owned by the defendant, Arkansas Anthracite Coal Company, by the sale of stock in said company, which employment was accepted and said stock sold to plaintiffs and others upon the representations that the stockholders of said company who paid their money for the stock purchased by them, and who are known as cash stockholders in contradistinction to the defendants, who are known as option stockholders, should be entitled to receive from the proceeds of the property of the company the amount of money paid in by them in

payment of stock before there is any distribution of the assets of the company among the other stockholders; that plaintiffs and the interveners hereinafter named paid for their stock upon the representation and understanding that their stock would be preferred as aforesaid; that all the stock of said company was issued to three trustees, who issued to the plaintiffs, defendants, interveners and others, trustees' certificates evidencing the amount of stock in said company to which each of them is entitled, and that no difference was made in the form of said trustees' certificates issued to the so-called cash stockholders and the so-called option stockholders.''

\*    \*    \*    \*    \*

''It is further ordered, adjudged and decreed that the foregoing plaintiffs and interveners upon payment by them of their respective share of court costs and of said solicitors' fee to be fixed by the court, and their surrendering their trustees' certificates to be stamped as hereinafter described, shall have and recover the amount set opposite their names in this decree from the proceeds of the property of said company before there is any distribution of the assets of the company among the other stockholders; that after the said amounts paid in by said cash stockholders have been repaid to them, they shall receive nothing further from the proceeds of said company until the par value of all the stock has been paid to the holders of all other trustees' certificates, and any surplus shall be distributed ratably among all the stockholders.''

J. W. Coffman and the other option holders alone have appealed, no appeal having been taken by Messrs. Remmel and Rose.

*G. O. Patterson* and *Sellers & Sellers*, for appellants.

1.   No cause of action is stated. It is not charged that the stock is not worth all they paid for it. No fraud is charged. The cause is barred on its face and the claim is stale. They were not influenced by the circular of Remmel and Rose. It was proper and legal

to pay for stock in property or labor. Const. Ark. 12, § 8. The only limitation is that full value be paid.

The business of a corporation is to be managed by a board of directors and not by a minority of stockholders. Kirby's Digest, § 841. The action is either barred or prematurely brought and no case of estoppel is made.

2. The promise of Remmel and Rose, if made, was without consideration and void. 2 Clark & Marshall on Corp., p. 1409. The subscription cannot be varied by parol. 92 Ark. 504-7; 1 Cook Corp. 81; 1 Morawitz Corp. 77; 2 Beach Priv. Corp. 531; 68 N. W. 15; 82 *Id.* 811; 93 *Id.* 669; 2 Clark & M. Corp., p. 1430.

3. Defendants owed plaintiffs no duty-but traded at arm's length. There was no fraud. The rule as to the trust relation is well stated in 71 Ark. 280. There is no trust where property is bought after the corporation is perfected for the purpose of a sale to it, that is as the agent of the corporation. Where one buys as agent he does not acquire the property at all. If he takes title, he merely holds the naked legal title in trust for the principal. 1 Thomps. Corp., § 108.

4. No such circular as alleged was published, but it only stated that Remmel and Rose would not be paid for their services. The circular was not a contract. The offer was never accepted. There could be no specific performance of the circular letter as it was never a contract. 12 Ark. 551; 23 *Id.* 704; 85 *Id.* 1.

5. The claim is barred by limitation, staleness and laches. *Smith* v. *Clay,* Ambl. 645; Wood on Limitation 151; 35 Ark. 141; 41 *Id.* 303; 64 *Id.* 345; Buswell on Lim., § 18; 12 Metc. (Mass.) 405, 411; 14 Ark. 21; 43 *Id.* 483; 58 *Id.* 589; 33 Fed. 447; 28 Fed. 285.

6. Remmel and Rose were never the agents of appellants. They represented the cash stockholders.

*Miles & Wade,* for appellees.

1. Appellants authorized the preference. The authority of the agent is immaterial. Cook on Corp.,

§ 140. Rose and Remmel were the agents of appellants in making the proposition.

2. Appellees accepted the preference proposition. Appellants cannot receive the benefits without the burdens. 1 Cook Corp., § 140; 70 N. J. L. 274; 78 N. Y. 159.

3. The contract is upon consideration and valid.

4. The agreement does not contravene the parol evidence rule. Fraud may be proven by parol evidence in any written contract. 1 Cook on Corp., § 140; 31 N. Y. 273.

5. There was no corporate action and none was necessary. The creditors are not affected. This priority or preference has been repeatedly upheld. Thompson on Corp., §§ 3598, 5269, 5314; 78 N. Y. 159; 70 N. J. L. 274; 78 Fed. 664; 95 Id. 197; 1 Cook on Corp. 764-5; 10 Cyc. 574-5, 577. 4 Thomps. on Corp., § 3604.

6. The preference can be enforced. Cases *supra* and 16 S. C. 524; 10 Cyc. 434.

7. This suit was seasonably brought. 4 Thomps. on Corp., § 3604.

8. The corporation cannot keep the benefits of fraud whether made by agent or under contract, or not. 1 Cook on Corp., § 140; 90 N. Y. App. 109. The suit was brought by all the cash stockholders as a class. 10 Cyc. 577. The findings of the chancellor are sustained by the preponderance of the testimony and should not be disturbed.

*Rose, Hemingway, Cantrell, Loughborough & Miles,* for Remmel and Rose.

HART, J. (after stating the facts). It was charged and is now claimed by appellees that Remmel was guilty of making false representations to induce appellees to sign their subscription contracts for stock in the company and that Rose allowed his name to be used in connection therewith. On the other hand it is insisted by appellants that there is no testimony in the record sufficient to sustain the charges of fraud and that there was no consideration for the circular letter sent

to the stockholders by Messrs. Remmel and Rose and that this circular letter did not create a binding obligation upon appellants when it was received and the terms thereof accepted by appellees. It is true there is no evidence in the record to show that either Remmel or Rose or the option holders were guilty of fraud; but it by no means follows that the circular letter did not create a binding obligation on the part of the option holders and Messrs. Remmel and Rose. The evidence shows that in June, 1905, serious differences arose between the cash subscribers of stock on the one hand and the option holders and Messrs. Remmel and Rose on the other. The dissensions aroused by their disagreements jeopardized the formation of the corporation, and in order to adjust these differences the circular letter referred to was mailed to each one of the cash subscribers for stock by Messrs. Remmel and Rose and was received and acted upon by the cash subscribers. The terms of the letter were accepted by the cash subscribers for stock. It will be noted that the cash subscribers to stock had charged appellants and Messrs. Remmel and Rose with fraud and were claiming that they were released from any further obligations to pay their subscriptions for stock. This circular letter was sent out in an effort to compromise their differences and to induce other parties to subscribe for stock, and did accomplish that purpose.

(1)    In *Gardner* v. *Ward,* 99 Ark. 588, this court held that the compromise of a disputed claim is a sufficient consideration to uphold the terms thereof, even though the claim be without merit. So, too, in *Fender* v. *Helterbrandt,* 101 Ark. 335, the court held that the compromise of a disputed claim is a sufficient consideration to support an express promise although there may have been no merit or foundation for such claim.

(2)    Again in *S. H. Kress Co.* v. *Moscowitz,* 105 Ark. 638, it was held that a compromise of a disputed claim furnished sufficient consideration to uphold the terms of a contract. Therefore we are of the opinion that the circular letter when received, its terms accepted and

acted upon by the subscribers of stock, created a binding obligation on the part of the option holders and Messrs. Remmel and Rose.

(3)    Again it is contended that Messrs. Remmel and Rose had no authority to send out the circular letter and to bind the option holders by its terms. We think the record warranted the chancellor in finding that they did have such authority. At least it clearly shows that their action was within the apparent scope of their authority and this was sufficient to bind appellants. The decree of the chancellor is right to the extent that it recognized the circular letter and the acceptance of its terms as imposing a binding obligation upon appellants, but we think the court erred in entering a decree against appellants in favor of appellees for specific sums set opposite the names of the respective appellees regardless of the debts of the company. To illustrate, there is a large indebtedness against the corporation and all its assets are charged with its payment. The corporation has something over 15,000 acres of coal lands and its indebtedness amounts to nearly $100,000.00. If the lands should be sold for $40.00 per acre, the proceeds of sale would have to be applied first to the payment of the debts of the corporation and this would absorb something more than $5.00 per acre of all the lands owned by the company and the remainder amounting to about $35.00 per acre on all the lands of the company would be required to pay the cash subscribers of stock; and there would be nothing left for the option holders. This would be inequitable and contrary to the terms of the agreement. The agreement contemplated that if the lands should be sold for more than $35.00 per acre that the option holders and Messrs. Remmel and Rose should be entitled to share ratably in the distribution of the assets of the company. The decree of the chancellor makes the shares of stock held by the option holders and by Messrs. Remmel and Rose under their agreement with the option holders, bear the whole indebtedness of the corporation. This was error. The shares of stock owned by the cash subscribers and the shares issued to

the option holders and to Messrs. Remmel and Rose under their agreement with the option holders, should bear ratably the debts of the company, and the balance should be distributed ratably between them if the lands are sold for more than $35.00 per acre. For instance, if the debts of the company amount to $100,000.00 and the coal lands of the company comprising some 15,000 acres are sold for $40.00 per acre, and the option holders and Messrs. Remmel and Rose under their contract with them, should own 51 per cent. of the shares of stock and the cash subscribers should own 49 per cent., the debts would have to be paid before any distribution of assets could be made, and of the remainder, the option holders and Messrs. Remmel and Rose under their contract with them would be entitled to 51 per cent. and the cash subscribers to 49 per cent. In this way, the obligation imposed by the terms of the circular letter would be upheld, and the assets distributed according to the intention of the parties as expressed by the terms of the circular letter.

From the views we have expressed, it follows that the decree should be reversed with directions to the chancellor to render a decree in accordance with this opinion.

It is so ordered.