L. MAXCY, INC., a corporation, et al., *Appellants*, v. NATHAN MAYO, as Commissioner of Agriculture, et al., *Appellee*.

139 So. 121.

En Banc.

Opinion filed November 14, 1931.

Opinion Rehearing filed January 6, 1932.

554

*H. M. Hampton,* of Ocala,, *Pat Whitaker* and *Tom Whitaker,* of Tampa, *A. B. Rowe* and *E. G. Grimes,* of Palmetto and *C. E. Ware,* of Clearwater, for Appellants;

*Cary D. Landis,* Attorney General, *Holland & Bevis,* of Bartow, *Peterson, Carver & Langston,* of Lakeland, and *Zewadski & Pierce, of Tampa,* for Appellees.

PER CURIAM.—The sole relief sought by the bill of complaint in this case is an injunction enjoining and restraining the defendants, as officers of the State of Florida, from enforcing the provisions of certain statutes of the State, and certain regulations issued under authority thereof by the Commissioner of Agriculture, and for no other relief. The statutes involved are Chapter 10103, Acts of 1925, Chapter 11844, Acts of 1927, Laws of Florida (Sections

3220-3254, C. G. L.) as amended by Chapter 14495, Acts of 1929, and Chapter 14662, Acts of 1931, of the laws of said State.

The Circuit Judge, upon bill, answer and affidavits, heard an application for a temporary restraining order, denied the injunction and dismissed the bill. From this order an appeal has been taken to this Court and the cause advanced for hearing on its merits upon appellants' application here for the relief sought in the court below. This application is grounded on two contentions: (1) that section 4 Chapter 11844, Acts of 1927, as amended by section 4 of Chapter 14485, Acts of 1929, is unconstitutional, and (2) that even if the Acts are constitutional and valid, that complainants have brought themselves within the provisions of an exemption recognized in Chapter 14485, to the effect that the provisions of Chapter 11844, as amended, shall not apply to fruit gathered within an area which had been quarantined for the Mediterranean fruit fly during the period of one year following the lifting of such quarantine.

The acts in question were before the Federal Courts in the case of Kilgore, et al. v. Mayo, Comm'r., et al., where an injunction on Federal constitutional grounds was denied August 26, 1931. See 51 Fed. (2nd) page ........ .

While the constitutionality of the Acts referred to is attacked by the bill here on the same and other grounds, and there is also questioned the validity of the Commissioner of Agriculture's regulations prescribed thereunder, and the enforcement of these regulations is sought to be prohibited, both on the ground that the acts under which they were made are invalid, and on the ground that the acts under consideration do not authorize such regulations, even if the acts are valid, we find it unnecessary to pass upon either of these questions, in order to dispose of the pending appeal. The practice of not doing so is the established one usually followed by this Court when difficult

constitutional questions of grave import to the public welfare are presented in the course of litigation which can be fully disposed of on other points which make a decision of the constitutional questions unnecessary. See Carolina-Florida Planting Co. v. Maige, 64 Fla. 235, 60 So. 346.

The bill of complaint alleges that the Commissioner of Agriculture has promulgated rules and regulations dated August 15, 1931, by the terms of which he has directed his inspectors to go upon the private property of persons where he has reason to believe citrus fruit has been sprayed with arsenic spray, and to seize and take possession of it, and that by such regulations the Commissioner undertakes to make a distinction and exception between persons who have sprayed their trees and fruit since the lifting of a quarantine in the State commonly referred to as the Mediterranean Fruit Fly Quarantine, and that unless enjoined and restrained from so doing that the defendants will seize and destroy a large amount of valuable citrus fruit belonging to the appellants and thereby deprive them of their property rights in same without due process of law.

The bill further alleges that the citrus fruits upon all of the groves of the appellants have been grown since the lifting of the Mediterranean Fruit Fly quarantine, which is alleged to have been discontinued in the State of Florida since the 6th day of December, 1930; that prior to said date the entire State of Florida East of the Aucilla River had been quarantined by the Federal Government and by the State Plant Board so that all fruit grown upon citrus groves East of the Aucilla River was within the quarantined area so quarantined on account of the existence of the Mediterranean Fruit Fly; that the groves of the appellants were situated within this area and that during the existence of the Mediterranean Fruit Fly quarantine the spraying of fruit trees with arsenic was permitted and authorized as a legal act and that there was never any order of the State Plant Board directing the persons using arsenic

sprays on their groves to cease using the same, which use had been a common practice from the early part of the Summer of 1929 until the date the quarantine was lifted.

The bill contains, among others, a special prayer to the effect that if the Court holds that the Acts of the Legislature under attack are not unconstitutional and void that then the Court should decree and determine that the fruit grown by the appellants during the year 1931, and which it may pick and gather from its groves before the 6th day of December, 1931, are not subject in any manner to seizure or destruction because of the special exceptions in favor thereof contained in the Act of 1929 which is hereinbefore referred to.

Chapter 14085, Acts of 1929, was an Act to amend Sections 1, 2, 3, 4 and 6 of Chapter 11844, Acts of 1927, prohibiting the use of arsenic, or any of its derivatives, as a fertilizer or spray on bearing citrus fruit trees, and to prohibit the sale or transportation of citrus fruit containing any arsenic.

The five Sections which were amended by the 1929 Act were amended so as to read as follows:

"Section 1. It shall be unlawful for any person, partnership, association or corporation owning, managing or tending and cultivating citrus groves or trees to use arsenic or any of its derivatives or any combination, compound or preparation containing arsenic as a fertilizer or spray on bearing citrus trees except when so ordered by the Federal Government or State Plant Board for the purpose of destroying the Mediterranean fruit fly.

Section 2. It shall be unlawful for any person, partnership, association or corporation to sell or offer for sale, transport, prepare, secure or deliver for transportation or market, any citrus fruit of any variety which shall contain any arsenic, or any compound or derivative of arsenic, provided it does not come from within a quarantined area or which has been within a quarantined area for one year previous to time of gathering of fruit.

Section 3. The citrus fruit inspectors who shall be

employed by the Commissioner of Agriculture in accordance with Section 9, Chapter 11875 of the Acts of 1927, shall be authorized to inspect citrus fruit hereunder at any packing house or other place where citrus fruit is being received or prepared for sale and transportation and to carry out the provisions of this Act in general under the direction and supervision of the Commissioner of Agriculture and subject to the provisions of law and the rules and regulations prescribed by the Commissioner of Agriculture, provided that this Section shall not apply to fruit within the area quarantined on account of the Mediterranean fruit fly.

Section 4. Whenever any citrus fruit inspector shall find citrus fruit at any packing house or other place where the same is being received or prepared for sale or transportation which citrus fruit shall, when tested under the provisions of Chapter 10103, Laws of 1925, show an abnormal and excessively high ratio of total soluble solids of the juice thereof to the Anhydrous Citrus Acid thereof, indicating the presence of arsenic therein, it shall become the duty of said inspector to at once seize and take possession of said citrus fruit pending the procuring of the Chemical analysis hereinafter provided for, notifying the manager or other person in charge of said packing house of such seizure. It shall be unlawful for the manager of said packing house or the owner of said citrus fruit, or any person whomsoever to sell, transport or in any way move or dispose of any of said fruit from the time of seizure thereof until after the making of said chemical analysis and the receipt of the chemist's report thereon; provided that no citrus fruit so seized may be held by any inspector more than 96 hours after the time of seizure thereof unless the same shall be shown by the chemist's analysis to contain arsenic; provided further that the provisions of this section shall not apply to fruit within the area quarantined on account of the Mediterranean fruit fly.

Section 6. All citrus fruit prepared for sale or transportation or which is being prepared for such purposes, or which has been or is being delivered for sale or transportation, that may be shown by chemical analysis hereinabove provided for to contain arsenic or any compound or derivative of arsenic shall be destroyed by the

inspector making seizure of the same or by any citrus fruit inspector or by the Sheriff of the County where found, as may be provided by regulations prescribed by the Commissioner of Agriculture, provided that this section shall not apply to fruit within the area under quarantine because of the Mediterranean fruit fly or that has been within the quarantined area during one year from the time of gathering of the fruit.''

Sections 2, 3, 4, and 6 above referred to each contain a specific exception to the effect that the terms of the Act prohibiting the selling or offering for sale, transportation or marketing of citrus fruit containing any arsenic and providing for the seizure of same shall not apply to fruit within the area quarantined on account of the Mediterranean fruit fly *or that has been within the quarantined area during one year from the time of the gathering of the fruit.*

It may be admitted that the language of the exceptions is susceptible of the construction that it applies only to fruit which was *in esse* at the time the Act became a law on June 29, 1929, but it is equally clear that it is also susceptible of the construction that it was intended to exempt any fruit containing arsenic which was grown or gathered within a quarantined area during one year from time of gathering of the fruit. The statute is highly penal in character and according to the allegations of the bill of complaint property rights of great value depend upon the construction of this Act which shall be adopted.

Statutes of this character, insofar as they undertake to impose penalties through the seizure and destruction of property, should be strictly construed, and where the meaning and intent of such statutes is doubtful, the doubt ought to be resolved in favor of the asserted rights of individuals alleged to have come in conflict therewith. Texas Co. v. Amos, 77 Fla. 327, 81 So. 471.

It is therefore the opinion of the Court that under the terms of Chapter 14485, Acts of 1929, fruit grown within

the area which had been quarantined from the Mediterranean fruit fly and which might be picked or gathered from groves during one year from the time of the lifting of the Mediterranean fly quarantine on December 6, 1930, is not subject to seizure and destruction under the provisions of the laws of this State prohibiting the sale, marketing or transportation of citrus fruit containing any arsenic, which fruit, though containing arsenic, was otherwise conformable to the requirement of the State and Federal Pure Food Laws as being fit for marketing and consumption, and that insofar as the bill of complaint prayed for an injunction to restrain the seizure and destruction of citrus fruits grown by the appellants during the year of 1931 and which it might pick or gather from its groves before the 6th day of December, 1931, presented an equitable ground for relief which should have been recognized by the Circuit Judge and that the injunction applied for to prevent the seizure and destruction of fruit of that description should have been granted as prayed for in the 7th paragraph of complainant's prayers for relief, insofar as such restraint was sought against the defendants to prevent them from enforcing the provisions of Chapter 11844, Acts of 1927, as amended, by seizing and destroying fruit of the complainants which had been grown or gathered from the formerly quarantined area within the one year period after the lifting of the quarantine.

It is therefore ordered that the decree appealed from be reversed and that the cause be remanded with directions to grant the injunctive relief prayed for in the seventh paragraph of complainant's bill of complaint, without prejudice however, to the right of the Commissioner of Agriculture, his agents or representatives, to proceed by criminal prosecution against the complainants or others, if so advised, for any violation of the criminal laws of the State which may have been committed, including violations of the arsenical spray laws, if any, and without prejudice to

the right of the said Commissioner or his agents to enforce any provision of the pure food laws of the State of Florida relating to or applicable to citrus fruits, and that in all other respects the prayers of the bill of complaint be denied and the bill as to such allegations dismissed without prejudice, the determination of the other questions presented by said bill and its other prayers for relief having been found to be unnecessary to dispose of this case. The costs of this appeal are ordered to be taxed in this court and the court below against the appellants.

A motion for an injunction here in the nature of a supersedeas having been filed and the case heard in regard to same, it is ordered that such motion be granted to the extent indicated in the paragraph of this opinion next above preceding, same to continue in force during the pendency of this appeal and until the remand of the cause to the court below for further proceedings.

Reversed and remanded with directions.

BUFORD, C.J., AND WHITFIELD, ELLIS, BROWN AND DAVIS, J.J., concur.

TERRELL, J.:—I think the statutes brought in question (Ch. 11844, Acts of 1927 as amended by Ch. 14495, Acts of 1929) susceptible to the interpretation placed on them in the opinion concurred in by the majority of the Court. I think however, that the constitutional validity of these acts should be determined in this proceeding. It is challenged and squarely presented, prosecutions have or doubtless will be instituted under them, parties affected are entitled to this knowledge and the Department whose duty it is made to enforce it will be advised of its power in the premises. I am mindful of the rule to the effect that if a cause can be disposed of on other than constitutional grounds the courts will pursue that cause but this rule like all others must bend to exceptions and I think in view of the consequences imminent this case offers a clear exception to the rule.

## On Rehearing

Per Curiam.—Upon petition for rehearing, it has been suggested by the Attorney General, representing the defendant State officers, that the Court should consider the fact that in the twentieth paragraph of the Bill of Complaint filed by appellants in the Court below, it was charged that the Commissioner of Agriculture and his assistants, were threatening to criminally prosecute the complainants, citrus growers, for alleged violations of section 1 of Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, under the claim and charge that the complainants were guilty of violating the provisions of said Act, which prohibit the spraying, or causing to be sprayed, with sprays or dust containing arsenic, or some derivative thereof, growing citrus trees in the groves of complainants.

It is also stated in the petition for rehearing, that the complainants' bill charges criminal prosecutions threatened under an alleged unconstitutional statute affecting property rights, and that therefore this makes a case cognizable by a court of equity in which the constitutionality of the statute may be determined. Great and valuable horticultural interests of Florida are represented as being affected by the doubt supposed to exist as to the legality of arsenical spraying of citrus groves. This and other considerations, so the petition suggests, make it highly desirable that the Commissioner of Agriculture be judicially informed as to his duty under Chapter 11844, as amended, so that he may know whether or not he is justified in continuing his attempted enforcement of that act at great public expense, with its constitutionality undecided.

In Ex Parte Lewis, 101 Fla. 624, 135 Sou. Rep. 147, this Court said in a case which involved a question as to the constitutionality of a part of the State's general fresh water fish and game law, that where a statute is questioned before this Court, and it appears that such statute is of great public importance to the State's welfare, so that a de-

cision on its validity will likely affect the course of conduct of a large number of citizens, as well as officers of the State, who are affected by the statute, that this court may be authorized to give its opinion on the matter, where the cause before the court has been fully argued and submitted for a fair consideration of the constitutional points raised. It was there declared, that such decision might be made, notwithstanding the admittedly sound rule that appellate courts should ordinarily decide cases involving constitutional questions, on points other than the constitutional ones, where that may be properly done in order to make disposition of the particular litigation before the court.

We have therefore granted the Attorney General's petition for rehearing, in order to give consideration to and decide, the constitutional validity of arsenical spraying of citrus trees, which is in terms forbidden by Section 1 of the Act under attack. We have done so at this time, because prior to the filing of the petition for a rehearing, whatever statutory exemption might have existed with reference to the consequences of arsenical spraying, necessarily expired on December 6, 1931, thereby leaving only the constitutional point to be decided.

Section 1 of Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, provides that it shall be a criminal offense for any person, partnership, association or corporation, owning, managing, tending or cultivating citrus groves, or trees, to use arsenic or any of its derivatives, or any combination, compound or preparation containing arsenic, as a spray or fertilizer *on bearing citrus trees,* except when authorized by the Federal government, or State Plant Board, for the purpose of destroying the Mediterranean Fruit Fly.

The exact language of the statute is that the use of arsenical combinations, compounds or preparations *on the trees* is the prohibited thing. We therefore eliminate from consideration any determination as to whether or not the

statute prohibits the ordinary use of fertilizers on the land, as a means of nurture and support to the soil, as distinguished from the application by sprays or otherwise of fertilizing substances to the trees themselves.

Where proceedings in the criminal courts have already been actually brought and are there pending, a court of equity has no jurisdiction to enjoin or stay such criminal proceedings. This is true even in cases where the bill alleges a threat of a multiplicity of intended future proceedings, and forfeitures incident thereto. And an equity court ordinarily has no jurisdiction to enjoin the *institution* of criminal prosecutions. Cline v. Frink Dairy Co., 274 U. S. 445, 47 Sup. Ct. 681, 71 L. Ed. 1146.

But there is a well recognized exception to the rule that courts of equity ordinarily have no jurisdiction to enjoin the institution of criminal proceedings by officers of the law. Thus, where criminal proceedings are actually threatened under a statute affecting alleged property rights, and an injunction is applied for to prevent the institution and prosecution of such criminal proceedings under the statute on the ground that such statute is unconstitutional, courts of equity have jurisdiction to enjoin the institution of the criminal proceedings when the circumstances of the case are exceptional, and the danger of irremediable loss is *apparently great and immediate to complainant's alleged property rights,* where such rights will likely be unlawfully interrupted, impaired, jeopardized or destroyed by the threatened enforcement of the alleged unconstitutional criminal statute sought to be enjoined. Philadelphia Co. v. Stimson, 223 U. S. 605, 32 Sup. Ct. 605, 56 L. Ed. 570; Ex Parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714; Cline v. Frink Dairy Co., *supra.*

In this case the criminal statute brought in question forbids the use on bearing citrus trees of fertilizers or sprays containing any arsenic whatsoever, or any of its derivatives.

Complainants are grove owners having citrus trees, and assert in their bill of complaint that they have a constitutional right to use such sprays for the protection of their property. They aver in substance that such use constitutes and is a part of their inherent right of enjoyment of such property itself. They further say that the statute in terms recognizes that arsenic may be legitimately employed as a protective means to destroy pests which habitually attack and destroy citrus trees and fruit. They contend that a legislative *fiat* which undertakes not merely to regulate, but to entirely prohibit, the use of arsenic in sprays, however small in amount it may be, is purely arbitrary and unreasonable, beyond the constitutional limits of the State's police power, and is in violation of both the Federal and State Constitutions as being in effect a deprivation of property without due process of law, and a denial of the equal protection of the laws. Weaver v. Palmer Bros. Co., 270 U. S. 402, 46 Sup. Ct. 320, 70 L. Ed. 654.*

Such allegations in the bill makes an appropriate case for the consideration of a court of equity. We are therefore required by them to determine whether the threatened interference by criminal prosecutions with complainant's asserted property rights in the use of arsenical sprays is unconstitutional. If found so, the court should grant an injunction against the defendants to restrain their interference. This the court would be required to do insofar as it might be necessary to secure complainants their right to enjoy property rights free from interruption under pretended authority of an unconstitutional law.

It is established by the record, that arsenical sprays, when applied to bearing citrus trees by dusting or spraying on the limbs and foliage, has an inevitable tendency to injuriously affect and injure the quality of the fruit produced.

---

*In this case a law of Pennsylvania forbidding the use of shoddy in comfortables, even when sterilized, was declared so far arbitrary and unreasonable as to violate the due process clause of the 14th Amendment to U. S. Const.

This is done by the action of the arsenic after it is absorbed into the tree. The result is invariably observed that fruit picked from citrus trees which have been subjected to frequent arsenical spraying appears in every respect like other citrus fruit of normal characteristics, but is in fact always inferior in taste and quality. It is demonstrated that this inferiority so occasioned in the fruit, cannot be detected from its appearance when offered in the market. Here the consumer is easily deceived and defrauded by the fruit's appearance as good, when it is intrinsically bad.

On the other hand, it is equally well established that arsenical sprays can be, and regularly have been for many years past, used in protecting citrus trees from insect pests which attack them, and that such use is regarded as perfectly proper and legitimate under ordinary conditions. But notwithstanding the use of arsenical sprays as a destroyer of citrus enemies, it is likewise well established that by their use ostensibly to guard against pests, citrus growers in the past have been enabled to produce and put on the market an immature and inferior grade of citrus fruit which is capable of passing all the ordinary maturity tests prescribed by the laws of Florida designed to prevent the shipment and sale of green or immature oranges. Chapter 10103, Acts of 1925, as amended by Chapter 11875, Acts of 1927; Sections 3220-3254 C. G. L.

Therefore it stands on the record as an undisputed fact, that while arsenical spraying of citrus trees may be legitimately employed for a proper purpose, it may be just as easily employed by unscrupulous citrus growers for an illegitimate purpose; that by their use such growers are habitually deceiving and defrauding their customers, by presenting to them fruit which to all outward appearances is of high grade and quality, when as a matter of fact it is of inferior grade,—insipid, unpalatable and unfit for human consumption, although passing the maturity tests.

Just what exact amount of arsenic must be used to pro-

duce such deficient fruit as will amount to a fraud on the customer, is not shown by the record. Neither was it known at the time the statute was enacted. Just what percentage of arsenic in a spray used on bearing citrus trees would have that effect is shrouded in doubt. But it is reasonably certain that a comparatively small quantity will have that effect. And it is also certain that when sprayed on citrus trees under favorable circumstances, arsenic and its derivatives has a peculiar affinity for assimilation with the sugars and acids of the fruit, so that it is transformed into the substances of the fruit itself in more or less definitely ascertainable quantities. Thus the inherent nature and tendency of all spraying of arsenic on citrus trees is for the trees to absorb and take in the drug through its foliage and transmit it to the substance of the fruit, notwithstanding the fact that small and infrequent applications can be made which will not materially affect the fruit as to quality.

But, because of the fact that the statute does not simply regulate the use of arsenic, so as to avoid the evils of its improper use, but undertakes to entirely prohibit such use altogether for any purpose, complainants contend that the statute is unreasonable and arbitrary, and must be struck down as an unconstitutional interference with the fundamental right of complainants to protect their rights of property in the citrus trees owned by them. The evil which exists, if any, complainants say, is in the excessive, not normal, use of arsenic as a dust or spray. Therefore there should be a statutory degree of permitted tolerance in its use, such as is asserted to have been recognized by the Federal authorities with reference to citrus fruits shipped in interstate commerce,—not an absolute prohibition of all use.

Complainants further contend that arsenic is always present in citrus fruit when it is produced naturally without spraying. They argue that to subject complainants to arrest, and their fruit to seizure, confiscation and destruction,

because small quantities of arsenic may be found therein by scientific analysis, is in effect to subject them to a possible criminal liability so uncertain and indefinite, that they could only hope to avoid the penalties of the law by refraining from growing citrus fruit at all, for fear that some fruit might be found which would show the presence therein of arsenic, whether sprayed thereon by complainants or not, thereby subjecting them to prosecution for something they could not reasonably guard against. Smith v. Cahoon, 283 U. S. 553, 51 Sup. Ct. 582, 75 L. Ed. 1264; Int. Harvester Co. vs. Kentucky, 234 U. S. 216, 34 Sup. Ct. 853, 58 L. Ed. 1284.

Whether or not this last contention is well taken, is not necessary to decide. The statute insofar as it prohibits the direct and deliberate application of arsenical sprays to the growing trees, is certain and definite as to what is denounced as a crime. Even though it should be conceded that the other sections of the Act cannot be enforced because of the objection last mentioned, that objection could certainly have no application to a prosecution under Section 1.

This Court takes judicial notice of the fact that the citrus industry of Florida is one of its greatest assets. Its promotion and protection is of the greatest value to the state, and its advancement redounds greatly to the general welfare of the commonwealth. For this reason the Legislature necessarily has a wide field of police power within which to pass laws to foster, promote and protect the citrus fruit industry of Florida from injurious practices which may tend to injure or destroy either the reputation or value of Florida citrus products in the world's markets. Sligh v. Kirkwood, 65 Fla. 123, 61 Sou. Rep. 185, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835.

Under the police power, the Legislature has the *right* to adopt suitable statutory regulations for the protection of health, the prevention of fraud, and the preservation of the prevailing public morals. This power which the Legislature

has to promote the general welfare of a State is very great, and the discretion which the legislative department of the government has, in the employment of means to that end, is very large. Powell v. Penna, 127 U. S. 678, 8 Sup. Ct. 992, 32 L. Ed. 253.

Legislative determinations that certain practices are evil and that they should be entirely forbidden, are entitled to great weight. But it is always open to interested parties to show that the Legislature has transgressed the limits of its authority, even in the field of police regulations enacted under guise of the police power. Invalidity of legislative action may be shown by things that are judicially noticed, or by facts established by allegations and proof, the burden being always on the attacking party to establish the invalidating facts claimed to exist. Penna. Coal Co. v. Mahon, 260 U. S. 393, 43 Sup. Ct. 158, 67 L. Ed. 322; Quong Wing v. Kirkendall, 223 U. S. 59, 32 Sup. Ct. 192, 56 L. Ed. 350.

It has long since become an established rule of constitutional law in these United States, that power and discretion, however exerted, and by whomsoever exercised, must be used in such manner as not to infringe upon or impair the fundamental rights of life, liberty, property and the pursuit of happiness. The very idea, (as one opinion delivered by the Supreme Court of the United States puts it) that one man may be compelled to hold his life, business, property, means of living or any material thing essential to his enjoyment of life, at the mere will of another, is intolerable in any country where freedom prevails, and is the very essence of slavery itself. Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

And since the supposed promotion of the public welfare has almost invariably been the excuse for all the arbitrary and unjustifiable deprivations of life, liberty and property which have heretofore been committed, from the time pagan Emperors burned Christian martyrs in the imperial am-

phitheatre at Rome to the date of the rendition of this opinion, the justification under our constitutional system for enacting laws interfering with property rights and individual freedom must be shown to rest upon considerations greater than the alleged promotion of the general welfare alone. Such laws must accord with the American guaranty that no man shall be deprived of life, liberty or property without due process of law, as this Court has so frequently declared. This means process of law within the power to prescribe law. State ex rel. Davis v. City of Stuart, 97 Fla. 69, 120 Sou. Rep. 335; Cawthon v. Town of DeFuniak Springs, 88 Fla. 324, 102 Sou. Rep. 250.

State laws prohibiting apparently well established uses and practices in connection with the handling, disposition and marketing of commodities of trade and commerce, when enacted under guise of the state's police power, and therefore entitled to every reasonable presumption in their favor to sustain them, may nevertheless, when attacked in a judicial forum, be made to appear so arbitrary and unreasonable in their application to a particular state of facts, that the courts will not hesitate to declare them inoperative and void, as violative of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. Weaver v. Palmer Bros., 270 U. S. 402, 46 Sup. Ct. 320, 70 L. Ed. 654.

In the case at bar, it is conceded that the use of arsenical sprays can be, and frequently is, made to serve the unrighteous purpose of producing a condition in citrus fruit which deceives and defrauds,—that tends for a certainty to destroy the reputation of Florida citrus products in the market.

Just what amount of such use might be safely permitted without producing this unhappy result, was unknown to informed authority at the time the Legislature passed the statute here considered. And indeed, to judge from the testimony now before the court coming from experts sup-

posed to be familiar with this subject, the question now of how much arsenical spraying can be permitted as a safe and harmless practice is far from settled. Therefore, it seems that the Legislature in 1927 in order to make the evil aimed at impossible of accomplishment, not only undertook to regulate the use of arsenic, but made it a criminal offense to employ it in any quantity whatsoever, as a spray or dust to be actually applied to the bearing trees.

By so doing, it is contended by the appellees that the Legislature has made a permissible police regulation, when we take into consideration the subject required to be dealt with, and the evil designed to be circumvented. And in making police regulations of this kind, the courts have frequently recognized what is called a ''reasonable margin of enforcement'' which is always permitted to the Legislature to the extent of enabling it to make unlawful perfectly innocuous and harmless acts, when essentially necessary as a means of preventing a dominant practice of generally evil propensity.

And so it has been held, that while constitutional guaranties can not be made to yield to mere convenience of enforcement, and while inhibitions of perfectly innocent acts or conduct cannot be made, merely because to do so will tend to more conveniently circumvent evasions of regulations which are within the legislative power to make (Weaver v. Palmer Bros., *supra;* Schlesinger v. Wisconsin, 270 U. S. 230, 46 Sup. Ct. 260, 70 L. Ed. 557), yet it is also generally recognized that if a certain practice is of general and predominantly evil tendency, so that it is impossible to distinguish the evil from the innocent in it except as to degree, that in such cases the legislature may sometimes prohibit perfectly innocent or harmless acts, as a means of insuring a statute's effectiveness against the dominant evil of acts of that same general class regardless of degree.

Acts innocent and innocuous in themselves may accord-

ingly be prohibited, if this is practically made necessary to be done, in order to secure efficient enforcement of valid police regulations covering the same general field. Purity Extract & Tonic Co. v. Lynch, 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. 184; 100 Miss. 650, 56 Sou. Rep. 316; Hebe Co. v. Shaw, 248 U. S. 297, 39 Sup. Ct. 125, 63 L. Ed. 255; Pierce Oil Co. v. Hope, 248 U. S. 498, 38 Sup. Ct. 172, 73 L. Ed. 381, 127 Ark. 28, 191 S. W. 405, Ann. Cas. 1918-E 143; Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 Sup. Ct. 114, 71 L. Ed. 303; Everhards Breweries v. Day, 265 U. S. 545, 44 Sup. Ct. 628, 68 L. Ed. 1174.

But the doctrine justifying the inclusion of what may be termed innocent acts, can be applied only as a necessary means to a legitimate end. Such inclusion must be reasonably required for the accomplishment of the legislative intent with respect to the ultimate object. It cannot be relied on to sustain a measure of prohibition so loosely or broadly drawn as to bring within its scope matters which are not properly subject to police regulations or prohibitions. Tyson & Bro.-U. S. Ticket Offices v. Banton, 271 U. S. 418, 47 Sup. Ct. 426. 71 L. Ed. 718; Adams v. Tanner, 244 U. S. 590, 37 Sup. Ct. 662, 61 L. Ed. 1336, reversing 221 Fed. 694; Weaver v. Palmer Bros. Co., *supra*. "It is not permissible to enact a law which, in effect, spreads an all inclusive net for the feet of everybody upon the chance that, while the innocent will surely be entangled in its meshes, some wrongdoers may be caught." Tyson & Bro. v. Banton, *supra*. " . . . . there is no profession (possibly no business), which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skillfully conducted agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranty of the constitution cannot be freely submerged if and whenever some

ostensible justification is advanced and the police power is invoked." Adams v. Tanner, *supra*.

Bearing these stated principles in mind, is the present statute valid when it undertakes to prohibit using as a spray on bearing citrus trees, any arsenic or its derivaties whatsoever, when the real purpose of the Legislature, is to guard against the harmful effects to citrus fruit caused by an improper and injudicious use of arsenical sprays on the trees?

The harmful effects designed to be avoided, are six in number and have been summarized in the record as follows: (1) change in taste of fruit caused by interference with sugar content: (2) formation of citric acid retarded; (3) total amount of sugars reduced; (4) Vitamine C content lessened or destroyed; (5) juice contents reduced in volume, and interior of fruit rendered dry and ricy; (6) keeping qualities adversely affected, both as to fresh and canned fruit. That such harmful effects are commonly experienced almost solely as the result of indiscriminate and promiscuous use of arsenic as a spray on bearing citrus trees, is beyond dispute.

But, so appellants contend, it is only the unwise and improper use of excessive quantities of arsenic which result that way,—the Legislature has no right to spread a net to catch all users of legitimate sprays, merely because some users accomplish evil designs by their own particular use of them. In this connection appellants emphasize that even this statute itself in its provisos, authorizes the use of arsenic as an insect pest destroyer, and that its use for protection of citrus trees has been long established as a regular and proper practice by responsible citrus growers, who for many years in the past have experienced no harmful results therefrom when properly employed.

But for the Legislature by statute to attempt a mere regulation of the use of arsenical sprays on thousands of citrus trees scattered about the State as they are, and sub-

ject to being sprayed by the growers at varying times throughout the year, would require the State to provide an army of enforcement officers to execute such a law. That would result in such grave difficulties in the way of results from attempted enforcement, as to suggest the likelihood that the legislative measure would prove wholly ineffective for the particular purpose designed to be accomplished.

Hence the Legislature has adopted an absolute prohibition of all use of arsenic as a spray, evidently on the theory that balancing the good against the evil in the practice, the evil far outweighs the good. It therefore appears that in order to render the statute reasonably certain of benefit, that it is necessary that all use whatsoever of arsenic sprays be prohibited, in order to preserve the general welfare of Florida's citrus industry, and the thousands of people who depend upon it for their livelihood and well being.

A Virginia statute providing for the cumpulsory cutting down of all red cedar trees within two miles of any apple orchard, and that this be required to be done by the owner without compensation to him therefor, has been upheld as constitutional by the Supreme Court of the United States, because of the demonstrated tendency of red cedar trees to become a host for diseases destructive to apple trees, as there shown. Miller v. Schoene, 276 U. S. 272, 48 Sup. Ct. 246; 72 L. Ed. 568.

And, as stated in the opinion in that case, when forced to make the choice, the State does not exceed its constitutional police powers by deciding upon destruction itself of one class of property in order to save when necessary another which, in the judgment of the Legislature, is of greater value to the public. Preferment of the public interest even to the extent of actually destroying property interests of the individual, has always been one of the dis-

tinguishing characteristics of every exercise of the police power which affects property.

Undoubtedly the last cited case presses to the extreme the scope of the police power. For this reason we ought not to regard it as any justification for upholding the right of the Legislature to unreasonably interfere with rights of personal freedom, of business and of property beyond the strict *necessities* of a situation shown to exist in a sphere where the police power may be justifiably required to be exercised in the interest of the general public.

Notwithstanding, however, the generally recognized limitations on the police power to which we have made reference, lawmakers frequently have attempted to carry it beyond its proper sphere. The current court decisions are full of cases dealing with such attempts. Not only does this unwholesome perversion of the police power under color of legislative enactments frequently appear in modern times, but it often extends to setting up a species of governmental paternalism over business and industry, in which the constitutional rights of the individual to possess and enjoy that which is his own, may be unlawfully submerged.

When appealed to in a proper case, the judiciary can render no greater service toward the perpetuation of free government than to accord to an individual litigant before it, however humble his station in society may be, the just protection of our fundamental law, when that protection is sought as a means to forestall aggressive combinations bent on employing the power of statutes to penalize the citizen for his rugged individuality in refusing to surrender his constitutional rights to what may be a contrary-minded political majority. *Vox populi, vox dei* is not the equivalent of *salus populi suprema lex esto* as recognized by the judiciary in our American system of constitutional law which gives rise to the exercise of police power by the government.

But it must also be remembered that the police power

of the state is not static. The Courts are in duty bound to recognize its expansion in proper cases to meet conditions which necessarily change as business progresses and civilization advances. The doctrine stated in Miller v. Schoene, *supra*, and Euclid v. Ambler Realty Co., *supra*, are forceful examples of such advancement.

When put to the choice by the practical necessities of the case, the Legislature may exercise its power to suppress an evil by prohibiting entirely a stated practice out of which that evil largely grows, even though by so doing, innocent acts may be forbidden and long established customs of the people thenceforth made unlawful. The application of that rule supports the validity of the statutory provision involved here, making it contrary to law to use arsenical sprays on bearing citrus trees, even though a limited use thereof would occasion no harm if it could be properly supervised.

We therefore hold that Section 1 of Chapter 11844, Acts of 1927, as amended by Chapter 14805, Acts of 1929, making it a criminal offense to use arsenical sprays on bearing citrus trees is a valid exercise of the police power of this State, and is constitutional. But in so holding we neither consider nor decide whether or not said statute can be construed as prohibiting the use in the soil, of ordinary commercial fertilizers containing arsenic, nor whether the statute so construed, would be constitutional under the rules to which we have heretofore made references.

It would seem however, that the most reasonable and obviously legal way of preventing the use of an arsenic element in fertilizers as applied to the soil, would be for the Legislature to provide for suitable regulations forbidding the manufacture or sale of arsenicated fertilizers. The present statute, if enforced to the extent it might be, would in effect put the burden on a citrus grower of being compelled to have a chemical analysis made of all fertilizer proposed to be used by him on the soil around his

citrus trees, for fear that he might be sent to jail, or have his fruit confiscated, should he unwittingly use a fertilizer containing arsenic, in ignorance of its illegitimate content. But as to this feature of the case, we make no decision at this time.

That the title to the Act here attacked is constitutionally sufficient, is sustained by the following cases: Johnson v. State ex rel. Maxcy, 99 Fla. 1295, 128 Sou. Rep. 853; Ex Parte Lewinsky, 66 Fla. 324, 63 Sou. Rep. 577, 50 L. R. A. (N. S.) 1156; State v. Bryan, 50 Fla. 293, 39 Sou. Rep. 929; State v. Vestel, 81 Fla. 625, 88 Sou. Rep. 477.

And that the prohibition of arsenic sprays on the grow-trees does not amount to an unconstitutional burden on interstate commerce, even though the citrus fruit grown is intended for shipment to points outside of the State, is settled by the principles stated in Sligh v. Kirkwood, 65 Fla. 123, 61 Sou. Rep. 185, 237 U. S. 52, 59 L. Ed. 835; 35 Sup. Ct. 501.

The injunction sought as to the threatened criminal prosecutions under Section 1 was properly denied, and the order to that effect should now be affirmed. Our mandate will contain an appropriate direction to that end. The cause is remanded for further decree in accordance with our previous decision in this case, which is otherwise adhered to on this rehearing.

Denial of injunction against criminal proceedings affirmed on rehearing, and cause remanded with directions.

BUFORD, C.J., AND WHITFIELD, TERRELL, BROWN AND DAVIS, J.J., concur.

ELLIS, J., dissents.

ELLIS, J., dissenting:—I think that the act of the Legislature under consideration in these proceedings and particularly Section 1 Chapter 14485 Laws 1929 is invalid, not only because considered as a criminal statute its operation is made to depend upon the non-action of the Federal Government or the State Plant Board when either agency

may deem it inopportune to begin operations to destroy the "Mediterranean fruit fly", but because the use of arsenical sprays is forbidden upon any citrus groves or trees.

"Bearing citrus trees" is a term which may include not only trees which produce citrus fruits that are actually in fruit as well as those which may come into fruit although not yet in bloom, but it embraces many species of fruits varying in shape, flavor, color and the uses to which they may be applied. The orange, lemon, lime, grapefruit, kumquat, pompelmous, shaddock, bergamot, citron and many other such fruits, embracing more than a hundred varieties, are citrus fruits and produced upon trees that come within the class designated by the statute. Many of these varieties, indigenous to tropical and semi-tropical climates or exotic, are produced or may be produced in this State. Some species of the citrus fruits the pulp and juice only are used while in others the rind only is used and is edible either as preserves or in the natural state, while the juice of others is used only for flavoring. The statute applies alike to all of them. The statute is not a health measure but is admittedly a regulatory measure designed to protect not the citrus fruit industry as it may be affected by marketing conditions but the industry as it relates only to oranges and possibly a limited variety of that fruit. As to grapefruit it is not apparent from the record that such fruit is affected in any appreciable degree from the use of arsenical sprays upon the trees at any time or in any quantity, nor is it shown by evidence nor is it a matter of judicial notice that the use of arsenical sprays upon lemon, lime. kumquat or citron trees in any quantity affects the marketability of the fruit or the quality of their content.

The act in question seems to have been enacted without any adequate knowledge of the effects of arsenical sprays upon many varieties of citrus fruits and in the apparently

mistaken thought that its terms applied only to orange trees. That the terms of the act apply only to orange trees and possibly grapefruit trees but to no other variety or species of citrus fruit trees seems to be the thought which pervades the act but on what theory such loosely constructed statutes may find a valid place in the body of the criminal law of the State the learned discourse in the majority opinion does not make clear.

Assuming that the use of arsenical sprays at any time and in great quantity may affect the sugar content and color of the fruit and its juice it is by no means apparent nor is it a matter of judicial knowledge that such results would affect the marketability or sugar content or flavor of hundreds of varieties of citrus fruits. Yet the owner of a grove of lime, lemon, or citrus trees or perhaps grapefruit trees who used an arsenical spray upon his trees would transgress the law.

I think the act is vague, indefinite and not capable of enforcement because its terms are inclusive of a great variety of citrus fruits to which there could not be any reasonable application of the act.