KILGORE GROVES, INC., v. NATHAN MAYO, as Commissioner of Agriculture.

191 So. 498

Opinion Filed August 1, 1939
Rehearing Denied October 24, 1939

*S. Whitchurst's Sons* and *Dickenson & Dickenson,* for Appellant;

*George Couper Gibbs,* Attorney General, *H. E. Carter,* Assistant Attorney General, *William C. Pierce* and *Mabry, Reaves, Carlton & White,* for Appellee.

PER CURIAM.—In this cause Mr. Chief Justice TERRELL, Mr. Justice CHAPMAN and Mr. Justice THOMAS are of the opinion that the decree of the Circuit Court should be affirmed, while Mr. Justice WHITFIELD, Mr. Justice BROWN and Mr. Justice BUFORD are of the opinion that the said decree should be reversed. When the members of the Supreme Court, sitting six members in a body and after full consultation, it appears that the members of the Court are permanently and equally divided in opinion as to whether the decree should be affirmed or reversed, and there is no prospect of an immediate change in the personnel of the Court, the decree should be affirmed; therefore, it is considered, ordered and adjudged under the authority of State *ex rel.* Hampton v. McClung, 47 Fla. 224, 37 So. R. 51, that the decree of the Circuit Court in this case be and the same is hereby affirmed.

Affirmed.

TERRELL, C. J., and WHITFIELD, BROWN, BUFORD, CHAPMAN and THOMAS, J. J., concur.

THOMAS, J.—The appellant, complainant in the circuit

court, has appealed from the final decree dismissing its bill of complaint praying for an injunction to restrain the Commissioner of Agriculture from seizing and destroying certain oranges, from interfering with the sale of the fruit and from "illegally obtaining evidence of purported violation of the Arsenical Spray Law of Florida."

The original bill of complaint was examined and discussed by this Court. Kilgore Groves, Inc., v. Mayo, 136 Fla. 615, 187 South. Rep. 256. Subsequently an amended one was filed and it was the allegations of this latter pleading that the chancellor held had not been substantiated by the testimony.

A resume of the averments follows: Oranges picked by appellant were seized by appellee whose duty it is to enforce Chapter 11844, Laws of Florida, Acts of 1927, as amended by Chapter 14485, Laws of Florida, Acts of 1929, known as the Anti-Arsenic Law. Appellant was notified by appellee's inspector that the fruit contained arsenic although it did not, according to the pleader, "contain arsenic" in violation of said law, because the content of arsenic as "might be found therein or thereon is only such amount as is found in all citrus fruits as a natural content thereof or is thereon in the form of a small arsenical residue that will naturally result from the use of common commercial lime-sulphur and copper-sulphate sprays universally used throughout the citrus industry of Florida." When tested under the provisions of 10103, Laws of Florida, Acts of 1925, the fruit did not "show an abnormal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citrus acid thereof." The fruit is normal in taste and appearance. No arsenic has been applied to the trees from which the fruit was taken, nor was any added to fertilizer used in the production of the crop. The test of

the product to determine whether or not the chemical was present was not by the use of the interior portion of the fruit but from the exterior or rind. The State chemist in making analyses of fruit in his search for arsenic therein has fixed a tolerance of .00028 grains of arsenic per pound of thinly shaved peel without any "basis in fact or authority of law." After the seizure a referee chemist found upon examination that "the ratio was absolutely normal in every respect."

The answer in general brings to issue the above allegations and in it the appellee asserts that the allowance of .00028 grains of arsenic is uniformly followed as a means of enforcing laws of this character and has been adopted as a result of years of study. The so-called tolerance "is well above any amount of arsenic which may appear in the fruit unless the same has been artificially applied."

Upon motion of the appellant, the court directed one of appellee's inspectors to take, in the presence of a representative of appellant and a representative of appellee, specimens of fruit from the groves involved in this litigation and to deliver one-half of each sample to an assistant State chemist and one-half to a chemist in the laboratory in Tampa. These chemists were ordered separately to make tests to establish the ratio of the total soluble solids of the juice to the anhydrous citric acid by examining: (1) the thin peel; (2) the entire peel; (3) the peel after being cleansed by methods used in preparation of fruit for sale; (4) the entire edible portion of the fruit after being washed; and (5) the entire edible portion of the whole fruit. Where the cleansed fruit was ordered examined it was also ordered that the cleansing solution be analyzed.

Then followed the introduction of testimony which, transcribed, comprises more than five hundred pages which

we have read. It shows exhaustively the experiences of the chemists who testified, including the State chemist, with reference to the reaction of arsenic on maturing fruit and the assimilation and distribution of the chemical through the leaf and root systems of the trees. Much of it, too, is devoted to the promulgation and application by the Commissioner of Agriculture of the rule referred to allowing a "tolerance" of .00028 grains of arsenic per pound of unwashed peel.

The question we are to decide is the authority of appellee to destroy oranges where arsenic is present in the peel of the fruit in excess of the tolerance and again we are faced with a construction of Chapters 11844 and 14485, *supra*. It is urged by appellant that an "abnormal and excessively high ratio of total soluble solids to the juice * * * to the anhydrous citrus acid thereof, indicating the presence of arsenic therein" must be shown before an analysis is justified, and that one of the deleterious effects, six in number, set out in the opinion in the case of L. Maxcy, Inc., v. Mayo, 103 Fla. 552, 139 South. Rep. 121, be established before appellee can resort to destruction of the fruit under the statutes. ,

Section 4 of the Act does not make an examination of the suspected fruit, to ascertain the ratio of soluble solids to juice content, a prerequisite to a chemical analysis for the detection of arsenic, but provides that when from such a test of fruit at a packing house this ratio is abnormal, "indicating the presence of arsenic," the inspector coming into possession of such information is duty bound to seize the questioned product and notify the person in charge. No fruit thus held may be retained more than ninety-six hours unless chemical analysis establishes the presence of arsenic. Another section of the Act, six as amended, provides that

all fruit, no reference being made to the edible portion as distinguished from the peel or "rag", that is shown by chemical analysis to contain arsenic or its derivatives shall be confiscated. It should be borne in mind that section 1 prohibits the use of the substance or any of its derivatives in fertilizer or spray material on bearing citrus trees without any qualifications except to destroy the Mediterranean fruit fly.

There appears no necessity, when the whole Act is considered and its purpose studied, for an inspector to further arouse any suspicion he may have of the presence of the prohibited chemical by an investigation of the ratio of solids to acid as a preliminary to a test to confirm or refute such suspicion. If he makes a chemical analysis to ascertain if any arsenic is present the result would certainly not be influenced by the ratio to which we have referred. Appellant's argument is plausible in the light of individual sections of the Act, but is unsound when applied to the whole.

We cannot agree either that there was any responsibility on the part of the appellee to show one of the harmful effects enumerated in Maxcy v. Mayo, *supra,* at page 130 of the opinion, 139 South. Rep. The law does not specify that one of these be established before confiscation, nor does the opinion indicate that. In discussing the Act generally it was merely stated that to avoid such evils the law was enacted. This part of the decision is more clearly understood when read with the whole and particularly:

"It is established by the record that arsenical sprays, when applied to bearing citrus trees by dusting or spraying on the limbs and foliage, has an inevitable tendency to injuriously affect and injure the quality of the fruit produced. This is done by the action of the arsenic after it is absorbed into the tree. The result is invariably observed that fruit picked

from citrus trees. which ·have been subjected to frequent arsenical spraying appears in every respect like· other citrus fruit of normal· characteristics, but is in fact always inferior in taste and quality. It is demonstrated that this inferiority, so occasioned in the fruit, cannot be detected from its appearance when offered in the market. Here the consumer is easily deceived and defrauded by the fruit's· appearance as good, when it is intrinsically bad." 139 South. Rep., text 127.

A large part of the transcript gives us the various uses of fertilizing and spraying materials beneficial in the effect upon the growing crop, but as we have observed before, abuse of this ostensibly lawful practice can easily result in the production of inferior fruit, thereby redounding to the discredit of a great industry.

"On the other hand, it is equally well established that arsenical sprays can be, and regularly have been for many years past, used in protecting citrus trees from insect pests which attack· them, ·and that such use is regarded as perfectly proper and legitimate under ordinary conditions. But notwithstanding the use of arsenical sprays as a destroyer of citrus enemies, it is likewise well established that by their use ostensibly to guard against pests, citrus growers in the past have been enabled to produce and put on the market any immature and inferior grade of citrus fruit which is capable of passing all the ordinary maturity tests prescribed by the laws of Florida designed to prevent the shipment and sale of green or immature oranges. Chapter 10103, Acts of 1925, as amended by Chapter 11875, Acts of 1927; Sections 3220-3254, Comp. Gen. Laws 1927.

"Therefore it stands on the record as an undisputed fact that while arsenical spraying of citrus trees may be legitimately employed for a proper purpose, it may be just as

easily employed by unscrupulous citrus growers for an illegitimate purpose; that by their use such growers are habitually deceiving and defrauding their customers, by presenting to them fruit which to all outward appearances is of high grade and quality when as a matter of fact it is of inferior grade—insipid, unpalatable, and unfit for human consumption—although passing the maturity tests."

"This Court takes judicial notice of the fact that the citrus industry of Florida is one of its greatest assets. Its promotion and protection is of the greatest value to the State, and its advancement redounds greatly to the general welfare of the commonwealth. For this reason the Legislature necessarily has a wide field of police power within which to pass laws to foster, promote, and protect the citrus fruit industry of Florida from injurious practices which may tend to injure or destroy either the reputation or value of Florida citrus products in the world's markets. Sligh v. Kirkwood, 65 Fla. 123, 61 So. 185; *Id.*, 237 U. S. 52, 35 S. Ct. 501, 59 L. Ed. 835." 139 South. Rep., text 127, 128.

The allowance of .00028 grains of arsenic to one pound of peel seems a fair effort on the part of appellee to enforce at once this important measure and save the grower any loss because of appearance of the prohibited substance from lawful uses. We observe in the above cited case that "there should be a statutory degree of permitted tolerance." The Legislature in several sessions has not seen fit to make the inhibition more lenient. Fulfilling his duty to enforce the law as it now exists and has existed for a decade, the appellee has fixed a sufferance of .00028 grains of arsenic to one pound of peel and there is abundant evidence that from all lawful uses of fertilizer or spray material there will not be an excess of that amount of arsenic in the matured fruit.

We have recognized the citrus fruit industry as one of the

most important in the State. The Legislature, to protect the marketability of the product and to maintain the confidence of the buying public, has made it unlawful to use a chemical which will hasten maturity and result in fruit of a quality inferior to that which nature would produce unaided. The legislative body made the inhibition absolute and placed the duty of enforcement in the Department of Agriculture. The appellee, head of that branch of our government, concluded that conceivably arsenic could appear which was not placed on the fruit or trees for the purpose of accomplishing the prematurity which the law was designed to prevent. It has been demonstrated that the "tolerance" to which we have referred will protect the grower who is innocent in the use of insecticides and fertilizers and at the same time assure to the consumer a product of the quality and fineness he has a right to expect when he buys Florida oranges.

There is little weight to the objection that the test is made from the rind instead of the edible portion of the fruit. The law makes no such distinction. Every reference is made to *the fruit* and the peel is a part of it. The rind or peel is not always destroyed and is in fact a food. Despite this, however, the State chemist gave a very plausible reason for making the test from the thin outer covering.

He related that the test of the peel resulted after discussions on the subject in the department and with growers. It was concluded that any accumulation of arsenic from previous applications, called "carry-over" or "hang-over," would be more apparent in the "rag" and juice while arsenic applied to the current crop would be evident in the peel.

Section 7, Chapter 11844, *supra,* makes it incumbent upon the Commissioner of Agriculture to promulgate rules and regulations to enforce its provisions and Section 3, as amended, Chapter 14485, *supra,* authorizes the inspectors to

examine fruit and "to carry out the provisions of this Act *in general under the direction and supervision of the Commissioner of Agriculture* and subject to the provisions of law and the rules and regulations prescribed" by him. (Italics supplied.)

The chancellor found that the fruit involved here did in fact contain arsenic, although not intentionally applied by appellant for the purpose of inducing prematurity. He concluded that it was caused by spraying grapefruit trees which were interspersed with the orange trees. He also frowned upon the examination of the unwashed peel in determining whether arsenic is present and observed that the process is fair where washed peel is used. With this, as well as his other findings, we are in accord. A residue of the chemical on the outside of the fruit which could be removed by cleaning should not be a basis for condemnation.

The findings of the chancellor on the law and the facts are abundantly sustained and the record discloses that the issues were thoroughly tried and ably determined. We feel that he was correct in entering a decree denying the prayer for an injunction and dismissing the bill.

The decree is affirmed.

CHAPMAN, J. (concurring).—The motive, policy or wisdom of legislation cannot be considered by this Court in the construction of statutes. The Legislature, in enacting the statutes now before the Court, in clear, certain and positive language makes it unlawful to use arsenic on trees by spraying or by placing it in fertilizer and applying the same in this manner to the trees. These laws make it a criminal offense to use arsenic by spraying the trees or applying it in fertilizer and this Court has sustained its constitutionality. See L. Maxcy, Inc., v. Mayo, 103 Fla. 552, 139 So. 121.

Where a statute is plain and unambiguous and admits of but one meaning, effect must be given it accordingly, and the courts in construing statutes will not be justified in departing from the plain and natural meaning of the language used in order to supply some supposed omission on the part of the Legislature. See Board of County Commissioners of Leon County v. State *ex rel.* Moore, 96 Fla. 495, 118 So. 313; Douglass, Inc., v. McRainey, 102 Fla. 1141, 137 So. 157. It is likewise well established that the language of a statute may be so plain as to fix the legislative intent and leave no room for interpretation or construction. See Osborne v. Simpson, 94 Fla. 793, 114 So. 543.

The Commissioner of Agriculture by the terms of the Act, has the power to promulgate the tolerance rule of the use of arsenic at .00028. This Court in innumerable cases has sustained similar statutes when the power to make rules and regulations is placed within boards and commissions. The Commissioner of Agriculture in promulgating this rule was acting within the power granted and an abuse of discretion conferred by the statute in the adoption of the tolerance rule has not been made to appear on this record. The power of the Legislature to enact the statutes now before the Court cannot be questioned. See L. Maxcy, Inc., v. Mayo, *supra.* If the appellant is aggrieved because of the hardships, injustices and burdens of this Act, his remedy is with the Legislature, because this Court in an unbroken line of decisions has held that this Court can not enact or repeal laws.

I cannot agree to the opinion prepared by Mr. Justice BUFORD for the following reasons: (1) It is asserted that the affirmance of the decree means the seizure and taking of the appellant's orange crop without due process of law. This contention, as I see it, is without merit because this Court

has upheld the Act under the police power of the Constitution and distinctly held that the right of the individual must yield to the interest of the majority. See Maxcy, Inc., v. Mayo, *supra;* Liggett Co. v. Amos, 104 Fla. 609, 141 So. 153; *In re:* Seven Barrels of Wine, 79 Fla. 1, 83 So. 627; Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789; State v. Ackerly, 69 Fla. 23, 67 So. 232; State v. Quigg, 94 Fla. 1056, 114 So. 859; Neisel v. Moran, 80 Fla. 98, 85 So. 346; Dutton Phosphate Co. v. Priest, 67 Fla. 370, 65 So. 282.

(2) It is further asserted that it has not been shown on the record that the arsenic found in the fruit rendered it unfit for human consumption. The Legislature when enacting the law now called into question, settled this contention when it said that it shall be unlawful to use arsenic on orange trees when spraying or applying fertilizer thereto containing arsenic. The opinion, *supra,* totally disregards this provision of the Act. If the people dislike or withhold their approval of certain laws, their remedy is clear and certain at the ballot box by sending to the Legislature representatives who will obtain a repeal thereof, but this Court cannot legislate or disregard a plain provision of the law making it unlawful to use arsenic in the form of a spray or fertilizer.

It is the law of Florida that this Court in interpreting or construing a statute, will look to the condition of the country to be affected by an Act as well as to the purpose declared, to ascertain the legislative intent and will read all parts of an Act together. What the general public knows this Court is presumed to know. See Amos v. Conkling, 99 Fla. 206, 126 So. 283; Tampa & J. R. Co. v. Catts, 79 Fla. 235, 85 So. 364.

The general public knows that the citrus industry in Florida is in a prostrate condition and this Court is charged with possessing this knowledge. The talent and energy of

men having money invested in this industry are unstintingly given to place this great industry on its feet, thereby promoting the general welfare of the people of Florida. One of the instrumentalities employed by this group of men is the enforcement of the law through the Commissioner of Agriculture prohibiting the use of arsenic in the production of fruit. It is contemplated that with the elimination of arsenated fruit, the market will become stable, prices better, and thereby a greater demand for Florida fruit. The Legislature approved the motive, policy and wisdom of the law, and in the absence of a better remedy for this sick industry, the will as expressed by the Legislature should prevail.

(3) The adoption of the opinion prepared by Mr. Justice BUFORD means in effect a repeal of the law making it unlawful to use arsenic in the growing of fruit. The Legislature has this prerogative and not this Court. I feel that the support of this Court should be freely given to advance not only the best interest of the citrus industry, but other industries affecting the progress of Florida and the general welfare of its people. Let the people repeal the Act if it is not productive of beneficial results.

The decree appealed from should be affirmed.

BUFORD, J. (dissenting).—I am unable to concur in the opinion prepared for the Court in this case by Mr. Justice THOMAS.

Statutes authorizing seizure and confiscation of property must be strictly construed. See Hart v. State, 89 Fla. 202, 103 Sou. 633.

In this case the Commissioner of Agriculture of the State of Florida has seized a part of plaintiff's citrus crop and has indicated that he will seize several hundred other boxes of plaintiff's fruit and destroy all of such citrus fruit.

The authority of the Commissioner to seize and destroy

citrus fruit because of containing arsenic is found in Chapter 11844, Acts of 1927. Sections 3, 4, 5 and 6 of the Act are as follows:

"Sec. 3. The citrus fruit inspectors who shall be appointed by the Governor upon recommendation of the Commissioner of Agriculture, and the special citrus fruit inspectors who may from time to time be designated by the Commissioner of Agriculture, in accordance with Chapter 10103, Laws of Florida, Acts of 1925, shall be authorized to inspect citrus fruits hereunder at any packing house or other place where citrus fruit is being received or prepared for sale and transportation and to carry out the provisions of this Act in general under the direction and supervision of the Commissioner of agriculture and subject to the provisions of law and the rules and regulations prescribed by the Commissioner of Agriculture.

"Sec. 4. Whenever any citrus fruit inspector or special citrus fruit inspector shall find citrus fruit at any packing house or other place where the same is being received and prepared for sale or transportation which citrus fruit shall, when tested under the provisions of Chapter 10103, Laws of 1925, show an abnormal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof, indicating the presence of arsenic therein, it shall become the duty of said inspector to at once seize and take possession said citrus fruit pending the procuring of the chemical analysis hereinafter provided for, notifying the manager or other person in charge of said packing house of such seizure. It shall be unlawful for the manager of said packing house, or the owner of said citrus fruit, or any person whomsoever to sell, transport, or in any way move or dispose of any of said fruit from the time of seizure thereof until after the making of said chemical analysis and

the receipt of the chemist's report thereon; provided, that no citrus fruit so seized may be held by any inspector more than 96 hours after the time of seizure thereof unless the same shall be shown by the chemist's analysis to contain arsenic.

"Sec. 5. Upon the making of seizure of any citrus fruit as provided for in Section 4 hereinabove, it shall be the duty of the inspector making said seizure to immediately draw samples therefrom as shall be provided for by regulations to be .issued by the Commissioner of Agriculture drawing said samples either from the packing bins, or elsewhere in the packing house, or from field boxes or vehicles delivering said citrus fruit to said packing house. Such samples, so drawn by said Inspector, shall be transported ·with all possible haste to such chemist or chemists as may be designated by the Commissioner of Agriculture for the making by such chemist or chemists of a chemical analysis thereof to determine whether or not the said citrus fruit contains arsenic. .It shall be the duty of said chemist or chemists to make said analysis with all proper haste and to report by the quickest means available the result of said analysis, as soon as the same is completed, to the Inspector making the seizure. If the said analysis shall show that the said citrus fruit contains no arsenic it shall be the duty of the inspector to release the fruit from seizure 'as soon as he receives the report of the chemist or chemists thereon.

"Sec. 6. All citrus fruit prepared for sale or transportation or which is being prepared for such purposes, or which has been or is being delivered for sale or transportation, that may be shown by chemical analysis hereinabove provided for to contain arsenic or any compound or derivative of arsenic shall be destroyed by the inspector making seizure of the same or by any citrus fruit inspector or by

the sheriff of the county where found, or may be provided by regulations prescribed by the Commissioner of Agriculture."

Section 4 specifically provides:

"Whenever any citrus fruit inspector or special citrus fruit inspector shall find citrus fruit at any packing house or other place where the same is being received or prepared for sale or transportation which citrus fruit shall, when tested under the provisions of Chapter 10103, Laws of 1925, show an abnormal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof, indicating the presence of arsenic therein, it shall become the duty of said inspector to at once seize and take possession of said ctirus fruit pending the procuring of the *chemical analysis hereinafter provided for. * * *"* (Emphasis supplied.)

Section 5 Specifically provides:

"Upon the making of seizure of any citrus fruit as *provided for* in Section 4 hereinabove, it shall be the duty of the inspector making said seizure to immediately draw samples therefrom as shall be provided for by regulations to be issued by the Commissioner of Agriculture, drawing said samples either from the packing boxes or vehicles delivering said citrus fruit to said packing house. Such samples so drawn by said inspector shall be transported with all possible haste to such chemist or chemists as may be designated by the Commissioner of Agriculture for the making by such chemist or chemists of a chemical analysis thereof to determine whether or not the said citrus fruit contains arsenic. It shall be the duty of said chemist or chemists to make said analysis with all proper haste and to report by the quickest means available the result of said

analysis, as soon as the same is completed, to the inspector making the seizure." (Emphasis supplied.)

Section 6 specifically provides:

"All citrus fruit prepared for sale or transportation or which is being prepared for such purposes, or which has been or is being delivered for sale or transportation, that may be shown by the *chemical analysis hereinabove provided for,*" etc. * * *

Sections 4 and 6, supra, were amended by Sections 4 and 5 of Chapter 14485, Acts of Extraordinary Session, 1929, but only by a proviso to the effect that the provisions of such Sections should not apply to fruit within the area quarantined on account of the Mediterranean fruit fly.

So there is no provision for seizing the fruit because of having been sprayed with arsenic except under the condition set forth in Section 4 of the Act and there is no provision for the confiscation and destruction of any fruit because of arsenic therein, except such as may be seized under Section 4 of the Act.

So the legislative determination was to prohibit the use of arsenic on citrus fruit but not to make citrus fruit subject to being seized and confiscated unless the fruit when inspected under the provisions of Chapter 10103, Acts of 1925, should "show an abnormal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citrus acid thereof, indicating the presence of arsenic therein."

Section 9 of the Act provides penalties by way of criminal prosecution for violation of the provisions of the Act and there are no limitations in the Act as to the method of acquiring evidence for criminal prosecutions.

The Legislature, however, has apparently determined that unless the arsenic content was sufficient to cause an "ab-

normal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof" there would not be sufficient detrimental effect upon the fruit by reason of the application of arsenic to warrant its seizure and destruction.

This must be true because the Legislature definitely provided in the four sections above quoted for each and every step to be taken in the inspection, examination and tests to be made to culminate in seizure and confiscation. The procedure prescribed by the Legislature for the seizure and confiscation of property must be strictly adhered to and followed. When the Legislature has provided the procedure by which property may be seized and confiscated the Legislature, and the Legislature only, may change the requirements. If the legislative requirements are not complied with in the seizure and confiscation by administrative officers, then one is deprived of his property without due process of law.

The contention that such construction if placed upon the Act will destroy its intended efficacy is not one to be heard by the judiciary, nor should it impel any administrative department to substitute its judgment for that of the Legislature. If the legislative authority in this regard has been too narrowly circumscribed, it is within the legislative power to broaden the authority, staying only within the bounds fixed by the Constitution. The administrative officers are bound to take the law as the Legislature has enacted it and the courts may neither take from nor add to the provisions of legislative enactments, except when required to do so because the enactment fails to meet the standard fixed by the Constitution.

It is affirmatively shown by the record in this case that the fruit involved did not contain arsenic, if at all, in such

quantity to in anywise affect its acidity, its soluble solids, or to be identified or separated by a chemical analysis of the whole fruit and that only a little more than a trace of arsenic could be determined by chemical analysis of a thin outer portion of the peel only. The record shows affirmatively that the fruit was not seized pursuant to the provisions of Section 4 of the Act, *supra,* and that the analysis was not made pursuant to a seizure under the provisions of Section 4, *supra.* Therefore, the seizure and the threatened confiscation and destruction is without authority of law.

Whether or not the so-called point of tolerance (.00028) fixed by the Commissioner of Agriculture is fair and reasonable is a question not at all involved in the disposition of this case. This question might become pertinent in a case where fruit has been seized under the provisions of Section 4, *supra,* but as there is no provision for confiscation because of arsenic content except pursuant to seizure under the provisions of Section 4, *supra,* the question of the reasonableness of the point of tolerance so fixed is not necessary to be considered in any case where grounds for seizure as provided by said Section 4 is not established.

The power to make rules and regulations conferred on an administrative officer or board does not include the power to change or amend legislative Acts and the rule-making and regulation-making authority conferred must always be exercised within the limits and standards fixed by the Legislature. If it were otherwise, government would become intolerable and citizens would be stripped of sacred rights without trial and without due process of law. This case is a fair example of such result.

The order appealed from should be reversed with directions that decree of injunction be entered.

## On Petition for Rehearing

Buford, J.—My interest in the disposition of this case is deep and far-reaching. The little citrus fruit involved is of no consequence. Whether or not there was or is little or much arsenic on or in that fruit is a matter of insignificant import.

The arresting question is: May private property be seized, confiscated and destroyed by the order of an administrative officer pursuant to procedure contrary to the express statutory provisions adopted and prescribed by the Legislature to be followed in such cases?

Shall this Court shift the Constitutional doctrine which we have followed for all the days of the past? If we do, we lead the way because thus far the judiciary of this country has held sacred freedom of speech, or press and of worship; the right to have one's home treated as his castle; the right of peaceable assembly; the right to trial by jury when life, liberty or property is involved; the right to be free from unreasonable searches and seizures.

Hon. Frank Hogan in his recent address before the American Bar Association said:

"Those who think lightly of shifts in constitutional doctrines must think lightly also of the importance of knowing what the law is. Is it to be a movable thing, changing and changeable after each reconstruction in the membership of courts? Is it to vary with the shifting currents of the political will? Or is it to be something certain, steadfast and enduring, upon which reliance can safely be placed?"

It has been suggested in argument before us that unless the authority is recognized in the Commissioner of Agriculture to make, promulgate and enforce the rules and regulations here involved, the result will be to frustrate the

legislative intent to prohibit the use of arsenic on citrus fruit trees.

That the enforcement of regulations as promulgated by the Commissioner of Agriculture will be more effective in curtailing the use of arsenic on citrus fruit trees than would be experienced by the enforcement of the limited provisions of Sections 4, 5 and 6 of Chapter 11844, Acts of 1927, affords no legal reason for denying the injunction in this case. Such fact, if it be a fact, may have foundation in expediency, but the question of expediency is for legislative, not judicial, consideration. When expediency is allowed to control judicial conclusions we shall have abandoned government by rule of law in favor of government by rule of men and our legal foundations will be as shifting as the sands and as changing as is the trend of public opinion.

Be it understood that we imply no adverse criticism of the Commissioner of Agriculture. We give him full credit for performing his official duties as he conceives them to be with the highest of motives and the best of intentions.

But under the Constitution the law-making power is vested exclusively in the Legislature. It is the paramount duty of the judiciary to recognize that power only in the Legislature.

That legislative power may be exercised by delegation only when and where the Constitution expressly authorizes such delegation can not be questioned. Article II, Constitution of Florida.

The disposition of this case involves the integrity of one of the foundation principles of government and it should be disposed of with that thought in the foreground.

The question of the reasonableness or fairness of the rules and regulations promulgated by the Commissioner of Agriculture is not one required to be determined here. The

question in this regard is, "Do the statutes of this State purport to confer upon the Commissioner of Agriculture authority to promulgate rules and regulations under which he may confiscate and destroy valuable personal property when such confiscation and destruction are not definitely authorized by a valid legislative enactment?" We say with confidence that such authority does not purport to be con- ferred and does not exist and we shall hereinafter support this view with citations of authority.

Neither is the question of the power of the Legislature in the exercise of the police power of the State, to command the confiscation and destruction of personal property pos- sessing baneful characteristics dangerous to life, health, morals or general welfare one required to be answered here. The power of the Legislature in this regard is admitted. The Legislature exercised that power in the adoptions of Sections 4, 5 and 6 of Chapter 11844 and by the provisions contained in those sections definitely stated the conditions, and the only conditions, under which citrus fruit could lawfully be confiscated and destroyed by order of the Com- missioner of Agriculture because of being infected with arsenic. That legislative Act has been amended only by Chapter 14485, Acts of 1929, so as to exclude its application to citrus fruit produced in the areas quarantined because of the Mediterranean fruit fly.

There is no claim or pretense that the fruit involved in this case was confiscated or seized under the provisions of Sections 4, 5 and 6, *supra*. The record shows conclusively and without contradiction that the fruit was not subject to seizure under the provisions of Section 4, *supra*.

We say with confidence that there is no legislative Act which authorizes the confiscation and destruction of any citrus fruit because of being infected with arsenic, except

that which may have been seized pursuant to the provisions of Section 4, *supra.*

The law is complete and clear as enacted by the Legislature and it is the duty of the administrative officers to enforce such laws as they are written by the Legislature. It is the duty of the Courts to construe the law as it is written. The courts are without lawful power to add provisions to the statutory enactments on the ground that unless something is added to the statute it will fail in the purposes for which it was enacted. Courts have no power to legislate.

The Legislature definitely limited the authority of the Commissioner of Agriculture in regard to making and promulgating rules and regulations by Section 7 of the Act in which it is provided:

"The Commissioner of Agriculture shall from time to time, as he may deem to be expedient and necessary, make and promulgate rules and regulations for carrying out and *enforcing* the *provisions* and *regulations of this Act.*" (Emphasis supplied.)

Sections 4, 5 and 6, *supra,* provided the rules and regulations for seizure, confiscation and destruction of citrus fruit because of being infected with arsenic, and Section 7, *supra,* did in no wise attempt or purport to authorize the Commissioner to seize, confiscate or destroy any fruit except that which may have been seized under the provisions of and in strict conformity with Section 4, *supra.*

It has been contended in effect that the Commissioner of Agriculture was authorized to make and promulgate such rules and regulations as might be necessary to effectuate the *purposes* of the Act. We find no basis for this in the legislative language. The purpose of an Act may be one thing while the provisions of the Act may be entirely inadequate

to effectuate the purposes. In such cases the Legislature may not delegate to an administrative officer, or to a judicial officer, the power to make and promulgate the regulations amendatory to the statute to cure is deficiencies.

The leading case in Florida on delegation of power is the case of State v. Atlantic Coast Line Railway Co., 56 Fla. 617, 47 So. 969, 32 L. R. A. (N. S.) 639, decided in 1908. In this case Mr. Justice WHITFIELD, speaking for the Court, said:

"The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law; but it may enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules. and regulations for the complete operation and enforcement of the law within its expressed general purpose."

This has been the controlling case in all situations dealing with delegation of power to administrative bodies and has never been modified or overruled. See also State v. Duval County, 76 Fla. 180, 79 So. 692; Bailey v. Van Pelt, 78 Fla. 337, 82 Sou. 789; Whitaker v. Parsons, 80 Fla. 352, 86 Sou. 247; Ex Parte Lewis, 101 Fla. 624, 135 Sou. 147.

There are numerous cases to the effect that property may be confiscated and destroyed under the police power of the State, without violating the due process clauses of the State and Federal Constitutions. An important case on this subject is Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. E. 205, where it is said:

"Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though these consequences may impair its use, do not constitute a taking within the meaning of the constitutional provision, or

entitle the owner of such property to compensation from the State or its agents, or give him any right of action."

The Mugler case, *supra,* is cited and quoted with approval in Pompano Horse Club v. State, 93 Fla. 415, 111 Sou. 801, 52 A. L. R. 51.  See also State v. Jackson, 152 La. 656, 94 Sou. 150.

In speaking about the police power of a municipality, this Court in Maxwell v. City of Miami, 87 Fla. 107, 100 Sou. 147, 33 A. L. R. 682, said:

"Any exertion of municipal authority or of the police power is subject to the provisions of organic law that are designed to conserve private rights.  In the exercise of the police power, property and individual rights may be interfered with, or injured, or impaired, only in the manner and to the extent that are reasonably necessary to conserve the public good.  An unreasonable or unnecessary exertion of municipal authority or of the police power in the manner or extent in which private personal or property rights are curtailed or impaired, violates organic law, in that it deprives persons of liberty and property without authority or due process of law."

There are also numerous cases which hold that the protection of the citrus fruit industry of this State by guarding it against destruction or serious injury by natural pests is an activity of the government resting for its authority upon the public interest affected by the success or failure of such industry and is within the police power of the State.  Johnson v. State, 99 Fla. 1311, 128 So. 853; Maxcy v. Mayo, 103 Fla. 552, 139 So. 121; Kilgore v. Mayo, 54 F. (2d) 132; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835.

Sections 262 and 263 of 11 Am. Jur., page 998 and 999, deal with the effect of the due process and equal protection

clauses, relative to delegation of power to administrative agencies.

In State *ex rel.* Wolyn v. Apalachicola Northern R. Co.; 81 Fla. 383, 87 So. 909, it was said:

"This Court has held that orders of the Railroad Commission fixing rates or making rules or regulations without obtaining or considering any substantial and pertinent evidence where investigation, inquiry and evidence are necessary as a basis for the action taken, the proceeding is not had in due course of law." State *ex rel.* R. R. Com. v. F. E. C. Ry. Co., 64 Fla. 112, 59 So. 385; State *ex rel.* R. R. Com. v. F. E. C. Ry. Co., 69 Fla. 165, 67 So. 906. And in many cases it has been held that where it appears from admissions of the pleadings that *orders* or *regulations* made by them are not *authorized by law*, such orders or *regulations will not be enforced by the courts.* State *ex rel.* R. R. Com. v. Southern Telephone Co., 65 Fla. 270, 61 Sou. 506; State *ex rel.* R. R. Com. v. F. E. C. Ry Co., *supra.* See also Interstate Commerce Commission v. Union Pacific R. Co., 222 U. S. 541, 32 Sup. Ct. 108, 56 L. Ed. 308; Interstate Commerce Commission v. Louisville & N. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431. (Emphasis supplied.)

In Richter v. State, 16 Wyo. 437, 95 Pac. 51, the statute provided that: "Any inspector, either Federal or State, shall have authority to inspect and quarantine and treat sheep affected with contagious or infectious diseases or suspected of being so affected, or that have been so exposed to any such disease; * * * "

The Court in upholding the constitutionality of the statute, said: "A conferred power of this nature is not inhibited by the Constitution because it is the method and practically the only method by which the State can enforce its police regu-

lations. The law is essentially of that nature, and the protection sought and the object to be attained must be by a summary method, and the State must act and act quickly through its agents who are clothed with certain powers in the performance of the duty. The power cannot be used arbitrarily nor oppressively, *but only in such cases and in the manner prescribed by the statute,* which being penal in its nature, must be strictly construed." (Emphasis supplied.)

The North Carolina Court in case of State v. Southern R. Co. (1906), 141 N. C. 846, 54 S. E. 294, has said:

"The crime is fixed and declared by the Legislature as expressed in the Act. The commissioner and board are only given power to establish the conditions and certain administrative regulations under and upon which the statute is made to apply."

Florida cases on this point are: State v. Atlantic Coast Line Ry. Co., 56 Fla. 617, 47 So. 969, 32 L. R. A. (N. S.) 639; Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789; State v. Fowler, 94 Fla. 752, 114 So. 435; Pridgen v. Sweat, 125 Fla. 598, 170 So. 653. And in *Ex Parte* Lewis, 101 Fla. 624, 135 So. 147, it was said:

"The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying the law; but it may enact a law complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials *within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.* The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its

execution, to be *exercised under, and in pursuance of law.* The first cannot be done; to the latter no valid objection can be made." (Emphasis supplied.)

Because I am fully convinced that no more important constitutional question may be presented to this Court than that which is presented in this case, and that a correct answer to that question must result in reversal of the decree of the lower court, I conceive it to be my duty to put these views in the record insisting that a rehearing be granted to the end that the guarantees of the due process clause of the Constitution of the State and Nation may be given effect and sacred property rights, be they great or small, may continue to enjoy judicial protection.

This opinion has been agreed to by the writer and Mr. Justice WHITFIELD and Mr. Justice BROWN while Mr. Chief Justice TERRELL and Mr. Justice THOMAS and Mr. Justice CHAPMAN dissent. Therefore the rehearing is denied because of the lack of a majority of the Court favoring rehearing. So ordered.

WHITFIELD, P. J., and BROWN, J., concur.

TERRELL, C. J., CHAPMAN and THOMAS, J. J., dissent.

BROWN, J. (concurring specially).—This case presents primarily a question of statutory construction as well as constitutional law. It is well settled that statutes authorizing the confiscation of private property must be strictly construed. Under the Constitution, private property can only be confiscated by following strictly the legislative provisions therefor, and those legislative provisions must be enacted for a public purpose which is itself authorized by the Constitution. Admitting the purpose of Sections 3, 4, 5 and 6 of Chapter 11844 to be a constitutional one, the statute as I construe it makes a strict compliance with Section 4 of the

Act a condition precedent to seizure and confiscation. I therefore think a rehearing should be granted on the grounds stated in the 5th paragraph of the petition. The statute gives the Commissioner of Agriculture authority to make regulations to enforce the provisions of the Act, but such regulations must not be contrary to any of such provisions, or permit the elimination of the requirements of Section 4 of the Act, which, as I construe the same, must be strictly complied with as the first step in the procedure upon which the power to confiscate rests. Thus the primary question here, and upon which there is a difference of opinion among the members of the court, is one of statutory construction.